In the Matter of the Application of THE PEOPLE OF THE STATE OF NEW YORK, by GEORGE S. VAN SCHAICK, as Superintendent of Insurance of the State of New York, for an Order to Take Possession of the Property of and Liquidate the Business of the NEW YORK TITLE AND MORTGAGE COMPANY.

Supreme Court, New York County, June 27, 1935.

*John J. Bennett, Jr., Attorney-General [Joseph C. H. Flynn, Assistant Attorney-General,* of counsel], for the petitioner.

*Harry Rodwin [Harry Rodwin* and *Abraham J. Halprin* of counsel], for the Superintendent of Insurance.

*Benjamin J. Rabin [Adolph Kaufman, Maurice Finkelstein, Joseph L. Kugel* and *Sidney Rodwin* of counsel], for the Mortgage Commission of the State of New York.

*Root, Clark, Buckner & Ballantine [Wilkie Bushby* and *Joseph Schreiber* of counsel], for the Board of Directors of New York Title and Mortgage Company.

*Barber, Fackenthal & Giddings [William A. Barber* of counsel], for the New York Title and Mortgage Corporation.

*Wagner, Quillinan & Rifkind [Simon H. Rifkind* of counsel], for Trustees of Series F-1.

*W. P. Clark,* director and stockholder in person.

*Leon Leighton [Thomas Keogh* and *Sidney Harris* of counsel], for Louis A. Green and another.

*Hall, Cunningham, Jackson & Haywood [Alfred Corby* of counsel], for certificate holder Corby.

*Guggenheimer & Untermyer [Jacob Harriss* of counsel], for certificate holder Steel.

*Henry Russell,* certificate holder in person.

*Edward Endelmen,* for certificate holder Pleayl.

*Cullen & Dyckman [Ralph W. Crolly* of counsel], for the Brooklyn Trust Company.

FRANKENTHALER, J. The motion is based upon three principal grounds: (1) That further transaction of the company's business would be hazardous to its policyholders, its creditors and the general public; (2) that the company is insolvent in the sense that it is unable to meet its obligations as they accrue in the regular course of business, and (3) that it is insolvent for the additional reason that its liabilities exceed its assets. The Superintendent, deeming that further efforts to rehabilitate the company would be futile, has applied for an order of liquidation. (See Insurance Law, § 402, subd. 2.)

On August 4, 1933, the Superintendent petitioned the court for an order directing him to take possession of the company's property and affairs for the purpose of rehabilitation. The same day, on the written consent of the company, authorized by a duly adopted

resolution of its board of directors, the prayer of the petition was granted and the company placed in rehabilitation. The order of August 4, 1933, is still in full force and effect and the company is at present in the possession and control of the Superintendent as rehabilitator.

In determining whether rehabilitation should give way to liquidation it is important to consider briefly the conditions and causes which led to the making of the order of rehabilitation. As each and every allegation of the petition for rehabilitation was expressly admitted in the answer filed by the company, the statements made in said petition may be accepted as facts and they will be treated as such in the following analysis of the circumstances which brought about the institution of rehabilitation proceedings. The company's business consisted of three major functions: (1) Title insurance and searches; (2) loans on first mortgages, and (3) the sale of guaranteed mortgages and certificates, together with the servicing of the mortgages so guaranteed. By August 4, 1933, the company *concededly* found itself " unable to meet the present and early future demands upon it for fulfilment of its obligations upon its guarantees as they matured." The outstanding guaranties of the company, as of June 30, 1933, amounted to $522,988,389.74. Obligations on guaranties of *principal* aggregating $1,917,532.01 had matured and the eighteen months' period of grace provided for in the policies of guaranty had expired. The period of grace had commenced to run, but had not yet terminated, as to guaranteed mortgages and certificates aggregating $37,563,320.31. The company was already in default on guaranties of *interest* totaling $2,554,957.27 (less premiums) which were past due and " which the company is unable to pay." Had it not been for the rules and regulations promulgated by the Superintendent of Insurance, pursuant to chapter 40 of the Laws of 1933, suits would have been instituted against the company and preferences thus obtained, for its assets were " frozen in real estate investments " and " payment of matured claims would have exhausted the available resources " of the company. The company's title plant, which had been a valuable asset in normal times, had become " practically valueless and wholly unproductive because of the inactivity in real estate business and the recent but generally expressed disfavor of the public as to title policies issued by a company which also has issued guaranteed mortgages and certificates, thereby subjecting the company's ability to pay losses of its title policies to the risk of the guaranteed mortgage business." An examination of the company's affairs by the Superintendent of Insurance had revealed that its condition was such " that *its further transaction of business*

*will be hazardous to its policyholders, its creditors, and to the public."*
This, as previously observed, was *admitted* in the company's answer.

Liquidation of the company under the market conditions which prevailed in August, 1933, would, however, have resulted in the sale of its assets for only a fraction of their book value and " in a complete loss of the potential value of the title insurance plant of the Company and its earning power." On the other hand, it was believed that rehabilitation might make it possible to preserve the value of the title plant and good will of the company, to a substantial extent, for the primary benefit of the creditors and policyholders, and that it might also permit any necessary sales of mortgages and real estate " in a more orderly and deliberate manner " than would be the case if immediate liquidation were applied for. For these reasons, the Superintendent sought judicial permission to rehabilitate the company rather than an order of liquidation. *The grounds for rehabilitation and liquidation being identical* (Insurance Law, § 403), the Superintendent could have obtained an order of liquidation had he asked for that relief, in view of the admitted fact that his examination of the company's condition had disclosed that the further transaction of its business was hazardous to its policyholders, its creditors and the public. (Insurance Law, § 401, subd. e.)

The petition for rehabilitation contained an outline of a plan of rehabilitation prepared by the Superintendent and approved by the company. It was clearly understood, however, that this plan was subject to change and that the carrying out of the plan " is not a condition of the consent of New York Title and Mortgage Company to its rehabilitation." The plan called for the formation of a new corporation to take over the title plant and good will of the company and part of its personnel, and also to service the mortgages and properties remaining in the hands of the Superintendent as rehabilitator of the company. It was thought that the title insurance business could be preserved, to a large degree, if the operation of that phase of the company's activities could be divorced from the risks and hazards attendant upon its guaranties of mortgages and mortgage certificates. The entire capital stock of the new corporation was to be held by the Superintendent for the benefit of the company's creditors and guaranty holders. The proposed plan was approved by the court as part of the order of rehabilitation.

After the company was placed in rehabilitation the following steps, among others, were taken in an endeavor to improve its condition: (1) The New York Title Insurance Company was created for the purpose of preserving the title business of the New York

Title and Mortgage Company; (2) the Servicing Corporation of New York was subsequently organized as a subsidiary of the New York Title Insurance Company, with the object of salvaging the business of servicing mortgages and properties, which had theretofore been conducted by the New York Title and Mortgage Company with a large and experienced personnel; (3) numerous releases were obtained from the holders of guaranties issued by the New York Title and Mortgage Company; (4) steps were taken to reorganize certificated issues under the Schackno Act; (5) suits were instituted against the directors of the New York Title and Mortgage Company for improper diversion of assets and other wrongful acts; (6) exchanges of Home Owners' Corporation bonds were made wherever possible; and efforts were made (a) to reduce real estate assessments, and (b) to increase the income from underlying properties, as well as (c) to reduce operating expenses.

In April of this year the Superintendent, believing that further efforts to rehabilitate the company would be futile, instituted the present proceeding for its liquidation, pursuant to subdivision 2 of section 402 of the Insurance Law, which reads as follows: "At any time the superintendent shall deem that further efforts to rehabilitate such insurer would be futile, he may apply to the court under this article for an order of liquidation."

The petition points out that the title insurance and title search business formerly done by the company is no longer available to it, that branch of the company's operations having been transferred to the New York Title Insurance Company. Similarly, the business of servicing mortgages and properties is no longer an asset of the company, a separate corporation having been organized to perform this work. The taking away of these various phases of the company's previous activities had been effected with the company's affirmative consent and approval. The only functions exercised by the company prior to rehabilitation which it still has the potential right to perform are the loaning of funds on the security of real estate mortgages and the sale of mortgages and these sole remaining rights are of no practical value at present, a condition which has obtained throughout the period of rehabilitation. Indeed, the financial situation of the company has been such that the Superintendent of Insurance has found himself compelled to prohibit any continuation of the business of lending money. The company is undeniably without sufficient funds to do this type of business, especially on a profitable scale. Furthermore, there is no real market for any mortgages which the company might obtain as security for its loans, and it is, therefore, highly improbable that any substantial profit could be earned from this branch of the

company's business, even if it had ample funds to lend out and the restrictions against loans were removed.

The petition for liquidation alleges further that the company is insolvent in that it is unable to meet its obligations as they occur in the regular course of business. As of June 30, 1934, the current free assets totaled only $8,052,531.02, consisting of, (a) cash amounting to $2,996,652.74, (b) marketable securities aggregating $709,232.41, (c) interest receivable (due and accrued) in the amount of $3,999,998.03, and (d) other assets valued at $346,647.84. The current unsecured liabilities, on the other hand, amounted to $34,840,518.49, which is $26,787,987.47 in excess of the current free assets. This condition is not a temporary one. On the contrary, the current liabilities have been increasing rapidly in relation to current assets and will undoubtedly continue to do so while present conditions continue. This is due to the following circumstances: (1) The rising increase in uncollectible interest arrears guaranteed by the company; (2) the increase in the current liabilities of the company as guarantor by reason of the expiration of periods of grace without a proportionate conversion of mortgages into cash or other current assets, and (3) " the inability of the company to better its current asset position out of earnings because the business functions which the company engaged in as a going concern prior to rehabilitation are no longer available to it."

The disproportion between current assets and current liabilities is even greater than these figures reveal. This is due to the fact that the current assets are subject to trust claims based upon wrongful acts of the company, such as the improper use of rents belonging to mortgagees in order to recoup interest previously advanced upon its guaranties. (*Matter of City Bank Farmers Trust Co.*, 149 Misc. 498; affd., 265 N. Y. 20; *Matter of Central Hanover Bank & Trust Co.*, 149 Misc. 488; affd., 265 N. Y. 30.) These claims are numerous and many are of large amount. The hearings before me in various Schackno proceedings have revealed that it was the common practice of the company to make these wrongful recoupments and that this has been done upon a very large scale. In *Matter of Lawyers Title & Guaranty Co.* (150 Misc. 174) I pointed out that there is no way of determining the amount of trust claims existing against the funds of an insurance company in rehabilitation, in view of the failure of the Legislature to make any provision for the filing of claims in rehabilitation proceedings (pp. 176 to 178): " It is, unfortunately, true that the Legislature has made no provision for the filing of claims against an insurer which is in the hands of the Superintendent of Insurance for purposes of rehabilitation. The sections of the Insurance Law which authorize

the filing of claims and the barring of unfiled claims are sections 404, 424, 425 and 426, and these apply solely to claims made in a ' liquidation proceeding.' In this state of the law, the Superintendent is obviously unable to determine with any degree of certainty the aggregate amount of trust claims which may ultimately be asserted against the funds in his possession as rehabilitator. It is quite likely that many claims of trust relationship, bailment and breaches of trust may be made in cases where the records in the Superintendent's possession fail to disclose any facts which would put the latter on notice of the possibility that such claims might be asserted. In the absence of a judicial determination of the validity of trust claims, the Superintendent is *a fortiori* unable to ascertain which claims are to be treated as proper, and which may be disregarded. * * * The court is fully aware of the hardship and injustice to the petitioner and others similarly situated, which must inevitably result from the denial of relief as to trust funds belonging to them which have been mingled with others in such a way that they cannot be specifically traced and identified. There is no way of knowing when rehabilitation will end. * . * * In the meantime claimants of mingled and unidentifiable trust funds are left without any remedy. Indeed, it is quite possible that the mingled trust funds belonging to the petitioner and others similarly situated are being used up for the purpose of operating the company during rehabilitation. It may well be that the company cannot be kept alive through rehabilitation without resort to these mingled trust funds. If this be the fact, if the efforts to rehabilitate the company are being financed with trust funds which do not belong to the latter, it is manifestly unjust and unfair to the owners of the trust funds to compel them to remain without remedy while their funds are being depleted. * * * By the time liquidation is ordered, if that course should ultimately prove necessary, the owners of the mingled trust funds may find them entirely used up."

The petition of the Superintendent recognizes the correctness of these observations, for it points out that " there is no method or procedure under the statute or under the law for the final determination of the claims of creditors in the rehabilitation proceedings; that there may be many trust claims, the determination of which in rehabilitation is difficult or impossible because there is no procedure under the law for determining the same."

It is not at all unlikely that the aggregate amount of the trust claims which may be properly asserted against the company's funds will ultimately be found to exceed the total of its net current assets. It is clear that the amount of the net current assets must, at least,

be substantially diminished by an appropriate reserve for the trust claims which may finally be held valid. It is quite possible that the rehabilitation of the company can be continued only by the use of assets which in reality belong to those holding valid trust claims, and do not properly constitute general funds of the company.

The outlook for any improvement of the company's condition is becoming increasingly worse as time goes on. Holders of guaranteed mortgages, in constantly mounting numbers, are terminating the company's agency to service the mortgages. Proceedings for the reorganization of certificated issues, under the Schackno Act (Laws of 1933, chap. 745) and now under the Mortgage Commission Act (Laws of 1935, chap. 19), are resulting in further terminations of the company's agency. Pursuant to the last-mentioned statute, the Mortgage Commission has taken over the functions of the Superintendent of Insurance as rehabilitator of the company with respect to the administration and servicing of certificated issues.

The company's lack of cash with which to meet the demands which may be made upon it is admitted in the affidavit of Frederick T. Kelsey, submitted in opposition to the motion for an order of liquidation. Not only is no denial made by the company of the allegations of the petition that the company is unable to meet its obligations as they occur in the regular course of business, but the affidavit affirmatively states that the company's " problem is solely that of obtaining sufficient cash to meet the demands therefor which may be made upon it." How the necessary cash is to be obtained does not satisfactorily appear. Vague suggestions are made that funds can be procured " by agreement with its creditors along the customary lines of reorganization and by obtaining funds from such sources as Reconstruction Finance Corporation." No concrete plan of reorganization is proposed, nor is any evidence submitted to indicate that there is any reasonable prospect of consumating a plan of reorganization which would enable the company to continue in business with safety to its creditors and to the general public. As previously stated, the only presently valuable phases of the company's business activities have been taken from it and transferred to separate corporations. What remains for reorganization is not much more than an empty shell. As to the possibility of obtaining loans from the Reconstruction Finance Corporation, it is sufficient to point out that by far the best assets of the company have already been pledged with the Reconstruction Finance Corporation for loans previously received from the latter and still outstanding. As of June 30, 1934, the company owed the Reconstruction Finance Corporation $8,185,-959.94, secured by assets of a book value of $17,512,905.35, more

than twice the amount of the indebtedness. There is not the slightest basis for assuming that any further loans in a substantial amount may be obtained. The probabilities are very much to the contrary. Admittedly the Reconstruction Finance Corporation long ago refused to make further loans to the company. Indeed, the opposing affidavit intimates that this refusal contributed to the company's collapse in the summer of 1933. There is nothing in the present financial condition of the company, especially in view of the character of its free assets, or in its prospects for the immediate future, to justify any reasonable expectation that it will be able to secure even a fraction of the funds which it requires in order to meet the demands which may be made upon it in the regular course of business. Much is said of improvement in the real estate market and of rising prices for real estate. It is clear, however, that whatever improvement there has been is trivial in comparison to the amount of improvement which is necessary in order to place the company in a position to obtain sufficient funds to enable it to meet its obligations as they mature. There appears to be no reasonable likelihood that real estate values will rise sufficiently in the near future to overcome the great disparity which now exists between the company's current liabilities and the funds available to meet them. Something more than hope is necessary to justify the continuation of rehabilitation at the expense of the trust claimants and general creditors whose position is becoming worse and worse as rehabilitation progresses. During the first eleven months of rehabilitation, from August 5, 1933, to June 30, 1934, a loss of $671,905, calculated on an *accrual* basis, was incurred. The *actual* loss was, however, much greater. The gross income for the period was arrived at by taking the difference between interest receivable and interest payable, without any reserve or allowance for uncollectible interest due on mortgages owned, pledged or guaranteed by the company. Out of interest receivable during the period in question, amounting to $19,139,847.85, only about $10,150,000 was actually collected. Most of the mortgages are not earning enough currently to pay all current taxes and interest. Past arrears remain, while additional arrears are constantly accruing. Most, if not all, the uncollected interest may be regarded as uncollectible, in which event the loss suffered during the first eleven months of rehabilitation is increased to more than $6,000,000. During the second half of 1934 the net loss was approximately $3,000,000 additional. If rehabilitation were permitted to continue, it would obviously not be very long before the company's liquid assets would be entirely wiped out, leaving nothing for its creditors.

If there were any reasonable basis for anticipating that the company could be resuscitated by prolonging the period of rehabilitation, I would not hesitate to deny the instant application for an order of liquidation at this time, despite the opinion of the Superintendent of Insurance that further efforts to rehabilitate the company would be futile. I have already withheld granting of a similar application by the Superintendent for an order terminating the rehabilitation of the Globe and Rutgers Fire Insurance Company and directing its liquidation (*Matter of Globe & Rutgers Fire Ins. Co.*, 148 Misc. 497). In that case, however, efforts were actually being made at the time to consummate a proposed plan of reorganization and there was considerable likelihood that these efforts would prove successful, not to mention the fact that the continuation of rehabilitation for the limited time allowed for the reorganization negotiations would not prejudice the company's creditors. Under such circumstances, although I expressly recognized that the " recommendations and views of an administrative officer, charged with the performance of statutory duties, are entitled to great weight * * * and are not to be disregarded or brushed aside except for cogent reasons " (p. 499), I took the position that strong grounds existed for declining to follow the Superintendent's recommendations without affording an additional opportunity for reorganization of the company. Subsequent events vindicated this stand, for the Globe and Rutgers Fire Insurance Company was successfully reorganized and the rehabilitation proceedings against it terminated.

In the case at bar, however, no plan of reorganization has been proposed, nor does justification exist for believing that there is any substantial likelihood that a reorganization may be effected for a long time to come, if ever. In the meantime rehabilitation is producing large losses which progressively impair the company's financial condition and the possibilities of a successful reorganization.

It is evident that it would be hazardous to the company's policyholders and creditors, as well as to the public, to permit the further continuation of the rehabilitation proceedings. Manifestly the company is insolvent in the sense that it is wholly unable to meet the demands which may be made upon it in the ordinary and regular course of business. The circumstances obviously justify the conclusion of the Superintendent of Insurance that further efforts to rehabilitate would serve no useful purpose, but would merely deplete the slender resources which still remain available to the company's creditors. An order of liquidation is not merely warranted; it is imperative. Only recently similar applications for the liquidation of two Westchester title companies were granted (*Matter of People, etc. [Westchester Title & Trust Co.]*, N. Y. L. J. May 25, 1935,

Special Term, Westchester Co.; *Matter of People, etc.* [*Lawyers Westchester Mortgage & Title Co.*], Id. May 25, 1935, Special Term, Westchester Co.).

In the case of the former, the court based its action upon the inability of the company to meet its maturing obligations, while in the case of the latter the decision was predicated upon the fact that the company's insolvent condition made it unfair to its certificate holders, general creditors and stockholders to permit a continuation of its business.

In view of the conclusion thus arrived at, it becomes unnecessary to consider the issue to which the company has directed almost all of its attention in opposing this application, namely, whether its assets exceed its liabilities. Great stress has been placed upon the provision in section 408 of the Insurance Law, for " a full hearing " on the return day of the application for an order of liquidation. The claim is made that the requirement of " a full hearing " imposed upon the Superintendent of Insurance an obligation to establish the allegations of the petition by proof complying with the strict rules of evidence applicable to ordinary trials. Assuming, without deciding, that this is true in respect to disputed and controverted charges contained in the petition, there appears to be no justification for placing such a burden upon the Superintendent in regard to matters which are admitted. As previously observed, the affidavit of Frederick T. Kelsey, submitted in opposition to the application for an order of liquidation, expressly admits that the company is confronted with the problem " of obtaining sufficient cash to meet the demands therefor which may be made upon it," without suggesting any definite method or plan by which the lack of the requisite cash may be overcome. This admission is tantamount to a concession that further transaction of the company's business would be hazardous to its creditors and, therefore, furnishes, in itself, ample justification for liquidation of the company pursuant to subdivision (e) of section 401 and section 403 of the Insurance Law. That the company recognizes that it is in no financial condition to resume or continue its business without great danger to its creditors is quite apparent from the repeated assertions in the opposing affidavit and at the hearing that the company was making no claim that the order of rehabilitation ought to be vacated and the company permitted to resume its business. Thus the affidavit of Kelsey states (p. 22): " We are not suggesting that the order of rehabilitation now be vacated and the Company permitted to resume its business where it was left off in March, 1933, on a guaranteed mortgage basis." The affidavit concludes with a request that (p. 34) " This application should be denied *without prejudice* so that the question

may be postponed to see the course of the revival in the real estate market, to await the determination of the legislative policy of the State, and to see whether genuine efforts to reorganize would not bear fruit." (Italics the court's.) At the hearing, counsel for the New York Title and Mortgage Corporation, which joined in opposing the entry of an order of liquidation, said (p. 560): " We are not asking to have the rehabilitation proceedings ended. There is no suggestion from the stockholders of the New York Title and Mortgage Company or from the directors or from anybody connected with them that this company should be handed back to them at this time." These various statements conceding, in effect, that the company still belongs in rehabilitation, constitute in themselves ample ground for the entry of an order of liquidation for, as pointed out earlier in this opinion, the grounds for rehabilitation and liquidation are identical (Insurance Law, § 403). As previously stated, the company had conceded in August, 1933, that the further transaction of its business would be hazardous to its policyholders, its creditors and the public. On the present application it has admitted that it possesses insufficient cash to enable it to continue its business without danger to those dealing with it and those to whom it is indebted. As a result of these circumstances and others mentioned above, the Superintendent has come to the conclusion that further efforts to rehabilitate would be futile. In the situation thus presented, it was clearly incumbent upon the company to go forward with proof indicating that the Superintendent's judgment in this respect was erroneous and that rehabilitation ought to be prolonged. This the company has utterly omitted to do. It has failed to establish that the causes of rehabilitation have been removed or that there is any reasonable likelihood of achieving beneficial results by prolonging the rehabilitation proceedings.

It may not be amiss in this connection to direct attention to circumstances which have materially impaired the company's prestige and good will, thereby furnishing additional support for the Superintendent's opinion that further efforts to rehabilitate would be futile: (1) The testimony before the Moreland Commissioner appointed by the Governor of this State in the inquiry relating to guaranteed mortgages, revealing that the appraisals of the New York Title and Mortgage Company were in many instances neither honest nor competent, and that the company indulged in many reprehensible practices, and (2) the recent indictments both in the State and in the Federal courts of former officers of the company for issuing a false financial statement and for mail frauds, as well as the indictment of the company itself for mail frauds. Even if the indictments should ultimately prove unjustified, the

damage to the company's good name and good will will undoubtedly be irreparable.

Some attempt is made to resist the application for liquidation on the ground that an order of liquidation would have a very detrimental effect upon the real estate market. Considering the comparatively small amount of assets available for sale upon the market, the fact that the Superintendent may, as he has done in the past, extend sales of assets over a reasonable period of time, and the further circumstance that the company's poor financial condition has been a matter of common knowledge for approximately two years, the court is inclined to agree with the judgment of the Superintendent that liquidation at this time would have no detrimental effect, to speak of, upon the real estate market. Even if the situation were otherwise, however, the court would not be warranted in denying an application for liquidation in a proper case, merely because of the bad effect which such action would have upon market conditions. The court must enforce the law as it stands. It cannot take the law into its own hands and deny liquidation under circumstances which the Legislature has declared require liquidation.

It is the judgment of the Superintendent of Insurance that liquidation is desirable and necessary. Only the strongest showing to the contrary could justify the court's refusal to follow the recommendations of the administrative officer to whom the supervision of insurance companies has been intrusted by the Legislature. No such showing has been made here. The motion is granted.

The various motions made during the hearings may be briefly disposed of. The motion to strike out the Barasch report, Superintendent's Exhibit 1, as well as all motions to strike out testimony are granted with appropriate exceptions. The motions to dismiss the petition are denied with exceptions to the respondents. Settle order.