In the Matter of the Liquidation of NEW YORK TITLE AND MORT-GAGE COMPANY.

Supreme Court, Additional Special Term, New York County, June 17, 1936.

*William A. Shea* [*Harry Rodwin, Joseph Lapidus* and *Jess H. Rosenberg* of counsel], for Louis H. Pink, Superintendent of Insurance of the State of New York, as liquidator of the New York Title and Mortgage Company.

*Benjamin J. Rabin* [*Michael F. Dee, Morris Amchanitzky* and *Leonard B. Boudin* of counsel], for the Mortgage Commission of the State of New York.

*James T. Heenehan* [*Francis F. Stevens* of counsel], for the Westchester trustees as *amicus curiæ.*

*Wagner, Quillinan & Rifkind* [*Simon H. Rifkind* and *Sidney R. Nussenfeld* of counsel], for the trustees of series F-1 and trustees of series F.

*Thomas Keogh,* for the trustees of series Q.

*Kramer & Kleinfeld* [*Barnet Kaprow* of counsel], for the reorganization committee of series BK.

*Olney & Geer* [*Olin Potter Geer* of counsel], for the trustees of series A-2.

*Weil, Gotshal & Manges* [*Frank L. Weil* and *Gabriel Kaslow* of counsel], for the committee on reorganization of series C-2.

*Milton B. Ignatius,* for the committee of creditors of Lawyers Mortgage Company.

*Barber, Fackenthal & Giddings* [*William A. Barber* and *Joseph Diehl Fackenthal* of counsel], for William P. Clark.

*Cullen & Dykman* [*Ralph W. Crolly* of counsel], for the Brooklyn Trust Company, a creditor of guaranties.

*Leon Leighton,* for Brentmore Estates, Inc., a creditor on various guaranties.

*Davies, Auerbach & Cornell* [*Milton A. Schenck* and *Ralph C. Williams, Jr.,* of counsel], for the Irving Trust Company.

*Sherman S. Rogers* [*Sherman S. Rogers* and *Joseph L. Callahan* of counsel], for the trustees of series 2, *amicus curiæ.*

*Mitchell, Taylor, Capron & Marsh* [*Edwin W. Cooney, Edward L. Hunt, Jr.,* and *William F. Hamilton* of counsel], for the City Bank Farmers Trust Company, a creditor on various guaranty contracts.

*Abraham N. Geller* [*Abraham N. Geller, Bernard A. Saslow, Leonard B. Frutkin* and *Robert B. Block* of counsel], for the Continental Bank and Trust Company, trustee for series N-83 and N-108; committee for series C-2, sponsoring certificate holders, and committees sponsoring the trustee plans for series N-58, N-59 and N-77.

*Raphael H. Weissman,* for the Golden Hill Building Corporation, stockholder.

FRANKENTHALER, J. This is a motion by the Superintendent of Insurance, as liquidator of New York Title and Mortgage Company, for an order approving and confirming his " First Preliminary Report and Petition." The report embodies the action taken by the liquidator upon four claims selected by him as " test cases for adjudication," two of them based on whole mortgage guaranty policies, one on a participation certificate in a single mortgage, and one on four participation certificates in a group series.

More than 40,000 proofs of claim have been filed in the liquidation proceeding, including a blanket proof of claim executed by the Mortgage Commission of the State of New York on behalf of all the certificate holders of the company, which the Superintendent regards as " effective to protect the interests of many holders of guaranteed mortgage participation certificates   *   *   *   who shall not have filed individual proofs of claim with the Liquidator prior to December 31, 1935." The Superintendent points out that " the determination and adjudication of claims based upon whole mortgage guaranty policies and guaranteed mortgage participation certificates involve questions of law which are to a large degree novel " and that " there has been no authoritative interpretation of the provisions of Article XI of the Insurance Law, enacted in 1932, to guide the Liquidator in the determination and adjudication of such claims." In the interest of economy and speed of liquidation, it was, therefore, thought advisable " to select a group of cases, representative of the major portion of the claims filed, to make adjudications, and to submit them " for the court's consideration " on notice to all who might be in a position to offer any suggestion."

The present motion to confirm is, in effect, " a motion for instructions from this court as to the method or standard or formula which shall be used in allowing the claims that have been filed." Although the four test cases cannot possibly include every variety of claim asserted against the liquidator, they are typical of a very large portion of the claims filed and also of the bulk of the claims which will be presented in the liquidation of other mortgage guaranty companies. The Superintendent of Insurance accordingly characterizes this motion as " probably one of the most important applications made by the Insurance Department to any Court." He points out that " while in form it involves the determination or allowance of only four specified claims on mortgage guarantees, the decision here made will vitally affect the distribution to the mortgage guaranty creditors, including holders of guaranteed participation certificates, of all the guaranteed mortgage companies now in the hands of the State."

The first question which arises relates to the provability of the claims. Section 404 of the Insurance Law declares, in respect of a domestic insurer whose liquidation has been directed by order of the court, that " the rights and liabilities of any such insurer and of its creditors, policy holders, stockholders, members and/or all other persons interested in its estate shall, unless otherwise directed by the court, be fixed as of the date of the entry of the order directing the liquidation of such insurer * * *. Provided, however, that the right of claimants holding contingent claims on said date to share in an insolvent estate shall be determined by section four hundred and twenty-five of this chapter." Subdivision 3 of section 425 contains the following provision for contingent claims: " No contingent claim shall share in a distribution of the assets of an insurer which has been adjudicated to be insolvent by an order made pursuant to section four hundred and twenty-four of this chapter except such claims shall be considered, if properly presented, and may be allowed to share where (a) such claim becomes absolute against the insurer on or before the last day fixed for the filing of proofs of claim against the assets of such insurer, or (b) there is a surplus and the liquidation is thereafter conducted upon the basis that such insurer is solvent." The power of the court to specify a date as of which the liabilities of the insurer shall be fixed may be exercised only at the time of the entry of the order of liquidation. (*Matter of Empire State Surety Co.,* 214 N. Y. 553, 567, 568.) Otherwise the focal date is the day of the entry of the order of liquidation. As the order of liquidation of the New York Title and Mortgage Company specified no time as of which claims should be determined, the provability of claims

depends upon their status on July 15, 1935, the date of the entry of the order of liquidation. No claims against the insolvent insurer which were contingent on that day may be allowed (*Matter of Empire State Surety Co., supra*) unless they became absolute on or before December 31, 1935, the last day fixed for the filing of proofs of claim. (See Insurance Law, § 425, subd. 3.)

The claim upon participation certificates in a *group* of bonds and mortgages (a so-called group series) was clearly absolute, and not contingent, on July 15, 1935. The provisions of the certificates and of the deposit agreement to which they are subject are substantially the same as those of the certificates and deposit agreement construed by the Court of Appeals in *Matter of People* (*Tit. & Mtge. Guar. Co.*) (264 N. Y. 69). Although the company's obligations in that case were in form those of a guarantor of bonds and mortgages owned by the certificate holders, the court, in an opinion by Judge LEHMAN, declared that, in substance (pp. 88, 89): " the guaranty company is a primary debtor, assigning the mortgages only as collateral security for the debt." This interpretation of the character of the legal relationship between the certificate holders and the guaranty company answers the only argument which could be advanced in support of a contention that the claim is contingent, viz., that the company was a guarantor and, as such, liable only in the event of a default by its principals, the obligors, on the deposited bonds and mortgages.

The question of whether the claims upon guaranties of *whole* mortgages and upon guaranteed participation *certificates in single mortgages* are absolute or contingent, is a more difficult one. The legal nature of the company's obligations in these instances has not been determined by the Court of Appeals. This court, sitting in the Additional Special Term for Rehabilitation, has uniformly held (1) that the holder of a whole mortgage covered by the company's policy is the owner, not merely the pledgee, of the mortgage, and that the guaranty company is a guarantor rather than the primary debtor; and (2) that the holder of a guaranteed participation certificate in a single mortgage is the owner of an undivided interest in the mortgage, the company's obligation being that of guarantor. (*Matter of Lawyers T. & G. Co.*, 157 Misc. 516, 519; *Matter of Lawyers Mortgage Company* [*545 West End Ave.*], Id. 813, 815.) The basis of these decisions has been the court's belief that in construing the company's obligation upon certificates in *group* series as that of a primary debtor in *Matter of People* (*Tit. & Mtge. Guar. Co.*) (*supra*), the Court of Appeals relied upon peculiar provisions of those certificates which are absent from the certificates

in *single* mortgages and from *policies guaranteeing whole mortgages*. The court's views as to the limited application of the case last cited are shared in an article in the Columbia Law Review on " Present Problems in New York Guaranteed Mortgages " (34 Columbia Law Review, 663, 681–683, 675, 681). Very recently the Circuit Court of Appeals reached the same conclusion in a case involving participation certificates in a *single* mortgage (*Matter of The Westover, Inc.*, 82 F. [2d] 177). Judge CHASE, writing for the court, said (p. 180): " This is not a case of the guaranty of bonds secured by one or more mortgages assigned to a trustee as security for the mortgagor's undertaking to pay the bonds which is the obligation guaranteed. *Nor is it the case of the issuance of certificates assigning no interest in any specific mortgage, but an undivided share in a principal sum secured by a group of mortgages deposited in a pool from which any security may be withdrawn provided the pool is kept ample in amount by the substitution of other security; where the certificates are payable in amounts and at times therein stated regardless of the due dates of any securities deposited in the pool;* and where the payment of the certificates has been guaranteed by a third party. *Such a situation as last outlined was disclosed in People v. Title and Mortgage Guarantee Company of Buffalo, 264 N. Y. 69, where it was held that the certificate holders had no interest in the pooled mortgages except as security for the obligation of the guarantor to pay the certificates which was the direct and primary obligation which the holders received when they purchased them.*" (Italics mine.)

Our own Court of Appeals has itself intimated that holders of *certificates in a single mortgage* may be owners rather than pledgees of undivided interests in the mortgage, thus limiting its analysis of the relationship between the company and certificate holders, in *Matter of People* (*Title & Mtge. Guar. Co.*) (*supra*), to certificates in *group* series. In *Matter of People* (*Westchester Tit. & T. Co.*) (268 N. Y. 432) the mortgage investments consisted of certificates in a *single* mortgage. Judge LEHMAN, writing for the court, said (pp. 439, 440): " In *Matter of People* (*Title & Mortgage Guarantee Co.*) (264 N. Y. 69) this court sustained the validity of the earlier statute (Laws of 1933, ch. 745) which conferred similar authority and powers upon the Superintendent of Insurance. *True, in that case, the mortgage investment was evidenced by certificates of different form, and the interest of the holders of the certificates in the mortgage investment may, perhaps, have been less direct than the interest of the petitioner, here, in the mortgage investment over which the Mortgage Commission is now asserting right of control.* Then, too, the provisions in regard to the depository of the mortgage are not the same.

Such differences are, however, immaterial where the question concerns only the right to possession and control of the mortgage investment. Such differences do not affect the basic conditions which justified legislative action for the protection of the general welfare and the interests of holders of certificates." (Italics the court's.)

As to *guaranteed whole mortgages*, there is likewise language of the Court of Appeals tending to indicate that their holders are owners rather than pledgees of the mortgages, and that the guaranty company's legal status is that of guarantor rather than that of a primary debtor. Thus, in *Matter of People (Lawyers Title & Guar. Co.)* (265 N. Y. 20) the opinion of the court, written by Judge (now Chief Judge) CRANE, repeatedly refers to the holder of the mortgage as " the mortgagee," to the company's obligation as " the contract of guaranty " and " the guarantee contract," and to the company as " the guarantor." Although the court's actual decision may, possibly, have been the same even if the holder of the company's policy were regarded as the pledgee, and not the owner of the mortgage, it is difficult to read the opinion without arriving at the conclusion that the company was thought to be the guarantor of a bond and mortgage owned by the holder of its policy.

In this connection it is well to bear in mind that the determination of the legal relationship existing between the company and the holders of its guaranties may have an important bearing upon their legality as investments for trust funds. This is pointed out in the article above referred to (34 Columbia Law Review, 683): " But in evaluating the construction adopted by the Court of Appeals (*Matter of People [Title & Mtge. Guar. Co. of Buffalo]*, 264 N. Y. 69), it must be recognized that cogent policy considerations influenced the decision. *Yet it cannot be disregarded that such interpretation casts some doubt on the certificates' compliance with the statutory definition of ' legals ' and strips the companies of their chief characteristics as insurers."* (Italics the court's.)

In the very recent case of *Matter of People [Title & Mort. Guar. Co.]* (270 N. Y. 629) the Court of Appeals expressly refrained from passing upon the question of the nature and legality of participation certificates in a group series (p. 630): " We express no opinion upon the question as to whether the participation certificates constituted legal investments for trustees or whether they constituted shares or parts of mortgages." *If holders of guaranteed whole mortgages and guaranteed certificates in single mortgages are held to be pledgees rather than owners of the mortgages or of undivided interests therein, as the case may be, the status of the mortgages and certificates as legal investments is seriously impugned.*

However, in the view this court takes of the matter whether the company's obligation on its " guaranty " of whole mortgages and of certificates in single mortgages is that of a primary debtor (the mortgages being pledged as security), or that of a guarantor is immaterial for the purpose of determining whether the claims involved upon the present motion are absolute or contingent. If the company is a primary debtor, the liability is obviously absolute and no real problem is presented. It is the court's opinion that even if the company is deemed to be a guarantor and the mortgage to be owned by the holder of its policy or the holders of its certificates, the obligation is likewise absolute. In the case of *whole mortgages*, the company guarantees payment of interest at a specified rate " when and as the several instalments of interest become due " upon the bond and mortgage, and " payment of the principal of the said bond and mortgage, and of every instalment thereof, as soon as collected, but in any event within eighteen months after the same shall have become due and shall have been demanded by the insured, with regular payment of interest in the meantime at the rate guaranteed." In the certificates representing undivided interests *in a single bond and mortgage*, the guaranties of interest and principal are substantially the same. The company's obligation to pay interest as well as principal to the holders of the mortgages or of the certificates is not, however, contingent upon the failure of the mortgagors to pay the interest and principal in accordance with the terms of the mortgages. The company is liable for the *interest* on the interest dates specified in each mortgage, *regardless of whether or not there is an interest default by the mortgagor*. The reason is that under the express provisions of the company's policies and certificates, their holders bind themselves to look only to the company for the payment of their interest or principal. They expressly agree " to refrain from collecting any part of said interest or of the principal secured by said bond and mortgage, except through this company," and they confer upon the latter an exclusive and " irrevocable " agency to collect the interest and principal. *Whether the interest due on the bonds and mortgages is or is not paid by the mortgagor*, the company is liable to the holders of its policies and certificates. There is, therefore, nothing contingent about its liability for interest. If said holders had the right to collect the interest from the mortgagor, there might, perhaps, be some basis for a contention that the company's obligation is contingent upon a default by the mortgagor. In the cases under discussion, however, the company's liability is not dependent upon the mortgagor's default, for, even if the mortgagor did not default, the company would, nevertheless, be liable for the interest received

by it from the mortgagor. For like reasons the company's obligation to pay *principal* is also absolute, and not contingent. It makes an unconditional promise to pay unpaid principal within a specified number of months after its due date under the bond and mortgage. The time of payment may be accelerated if, and to the extent that, the company collects principal from the mortgagor, but it cannot be postponed or the right to payment defeated. *Irrespective of whether collections are or are not made by the company, it, and it alone, is liable for the principal to the holders of its policies and certificates.* It undertakes to pay the principal to the latter *in any event*, out of the collections as and when made, and out of its own funds, within a specified period, to the extent that overdue principal remains uncollected at the end of that period. Under no circumstances could the company escape liability for the principal while its exclusive right to collect remained in force. *If collections were made it was liable, and if they were not made it was likewise liable.* The only uncertainty affecting the company's obligation to pay principal relates to the *time* the payment must be made, not to the *necessity* of making the payment. This conclusion is not affected by the provisions requiring a demand upon the company to start the running of the period of grace. The order of liquidation rendered any demand futile and, therefore, obviated the making of a demand. Moreover, even if a demand were indispensable to a recovery, the necessity therefor would affect only the time of payment, not the certainty of the company's liability to pay. The provability of absolute claims does not depend upon whether they have become due and their amount fixed at the time of the order of liquidation or such other date as the order may fix. (See Glenn on Liquidation, § 488; *Matter of Empire State Surety Co., supra.*) In the case cited the Court of Appeals declared (p. 564) that the insolvency of the insurer disabled it from performing its obligations under its contract to defend such suits as were brought against the assured and were within the policy, and accordingly held (pp. 563, 565) that even those who settled claims against them after the order of liquidation possessed provable claims against their insurer. The court accordingly holds that the four claims involved upon the present application are absolute, and not contingent, and that they are, therefore, provable in the liquidation proceeding. Whether this conclusion is also applicable to claims based upon policies covering whole mortgages or participation certificates in single mortgages, in cases where the agency of the guaranty company was terminated before July 15, 1935, is a question which is not presented here and which must await determination until an application involving such claims, which are undoubtedly few in number, is submitted to the court.

The next question to be considered is whether, in allowing claims, the value of the guaranteed mortgage or mortgages must be deducted from the amount due and unpaid upon the company's guaranty. Prior to the enactment of chapter 119 of the Laws of 1918, which amended section 63 of the Insurance Law, the rule laid down by the courts of this State was that, in the absence of legislation requiring a contrary result, a secured creditor of an insolvent might prove for the full amount of his claim, without making any deduction for the security, and receive dividends upon that amount, applying any security held by him toward the balance thereafter remaining. (*People* v. *Remington*, 121 N. Y. 328.) Of course, if the collateral security was more than sufficient to satisfy any deficiency in the debt after crediting the dividends received, the insolvent estate was entitled to receive the excess. (*People* v. *Remington, supra.*) This rule is, however, no longer applicable to claims against an insolvent domestic insurance company. The 1918 amendment to the Insurance Law, previously referred to, added a provision reading as follows: " No claim of any secured creditor or claimant shall be allowed in any proceeding under this section at a sum greater than the difference between the value of the security and the amount for which the claim is valid, unless the creditor or claimant shall surrender his security to the liquidator, in which event the creditor or claimant may file a claim and become a claimant for the full amount thereof."

In 1932 section 63 of the Insurance Law was repealed by chapter 191 of the laws of that year, in effect March 15, 1932. A new article was added to the Insurance Law (Art. XI), containing, among others, the following provision (§ 425, subd. 5): " No claim of any secured claimant shall be allowed at a sum greater than the difference between the value of the security and the amount for which the claim is allowed, unless the claimant shall surrender his security to the Superintendent in which event the claim shall be allowed for the full amount for which it is valued." The language of this subdivision clearly covers the claim upon the certificates in the *group* series. The Court of Appeals has held that the holder of such certificates does not own undivided interests in the deposited bonds and mortgages, but is merely the pledgee of the interests, the guaranty company being " a primary debtor, assigning the mortgages only as collateral security for the debt." (*Matter of People* [*Title & Mtge. Guar. Co.*], *supra*, at pp. 88, 89.) A somewhat different problem is presented as to the remaining claims by the holders of the policies guaranteeing *whole mortgages* and of certificates in *single* mortgages. If the company is deemed the primary debtor and the holders of the policies and certificates are regarded as

pledgees, rather than owners of the mortgages or of undivided interests therein, their claims are likewise covered by the language of subdivision 5 of section 425. If, on the other hand, these claimants are held to be owners of the mortgages, or of interests therein, as the case may be, it becomes necessary to determine whether they are " secured claimants " within the meaning of that subdivision. The contention is made that a similar provision in the National Bankruptcy Act (§ 57, subd. [e]; U. S. Code, tit. 11, § 93, subd. [e]) has been held to apply only to claimants holding security *belonging to the debtor*. This ruling is, however, based upon the express provision of the Federal statute that " ' secured creditor ' shall include a creditor who has security for his debt *upon the property of the bankrupt* of a nature to be assignable under this title, or who owns such a debt for which some indorser, surety, or other persons secondarily liable for the bankrupt has such security upon the bankrupt's assets." (Bankruptcy Act, § 1, clause [23]; U. S. Code, tit. 11, § 1, clause [23].) (Italics the court's.) Thus, in *Ivanhoe Bldg. & Loan Assn.* v. *Orr* (295 U. S. 243), in holding that the petitioner in that case was not a secured creditor, the United States Supreme Court said (p. 245): " Petitioner does not come within the definition, for at the date of bankruptcy it held no security against the bankrupt company's property, nor security given by any other person who in turn was secured by the bankrupt's assets. Sections 1 (23) and 57 (e) do not, therefore, forbid the proof of a claim for the principal of the bond with interest, though the petitioner may not collect and retain dividends which with the sum realized from the foreclosure, will more than make up that amount." Another case to the same effect is *Matter of United Cigar Stores Co.* (73 F. [2d] 296). The definition of " secured creditor " which forms the basis of these bankruptcy decisions represents a limitation or restriction of the popular and generally accepted meaning of those words (Collier Bankruptcy [13th ed.], p. 27): " Secured Creditor.— This term is defined in subdivision 23 of this section. Under this definition a creditor, to be secured, must either (a) hold security against the property of the bankrupt, or (b) be secured by the individual obligation of another who holds such a security. *This definition thus restricts the popular meaning.* The English definition, ' a person holding a mortgage, charge or lien on the property of the debtor, or any part thereof, as security for a debt due to him from the debtor,' is even more restrictive than is ours. *Thus, in both systems, creditors may often be secured and yet not be secured creditors.*" (Italics the court's.) The definition of " secured creditor " found in the Bankruptcy Act has not been carried over into the Insurance Law of this State. In fact, that statute contains no provision

defining the words " secured claimant " or " security." These words must, therefore, be construed in the sense in which they are ordinarily and generally understood, not in the narrower sense required by the Bankruptcy Act. The adoption of the bankruptcy provision regarding the proving of secured claims, without at the same time taking over the bankruptcy definition of " secured creditor," is a significant circumstance, tending to indicate that the Legislature of this State intended the words " secured claimant " to be interpreted in the broader sense in which they are commonly used. It is difficult to escape the conclusion that the claimants here are " secured " in the popular and ordinary sense of the word. They hold not merely the company's obligation, but also mortgages or undivided interests in mortgages. Their total recovery from *both* sources is limited to the amount due on the company's obligations. They may not retain for themselves from the proceeds of the mortgages more than is necessary to satisfy the balance due them upon the company's guaranties. The mortgages tend to assure and make more certain the recovery of the amount guaranteed by the company. In this sense they constitute security for the claims asserted against the latter. " Secured creditor " has been defined as one " who holds some special pecuniary assurance of payment of his debt, such as a mortgage or lien." (Black Law Dict. [3d ed. 1933], p. 1595.) Another definition expressly recognizes that the security need not necessarily belong to the debtor: " Secured Creditor. A creditor who holds a security which will cover the amount the debtor owes him. Among these securities may be classed mortgages, deeds, bills of sale, a lien upon goods, warrants, delivery orders, good stocks and shares, or any other security which can be readily sold in the open market. It *also* means a person holding a mortgage charge or lien *on the property of the debtor*, or any part thereof, as security for a debt due to him from the debtor." (Sturges & Hewitt, Dictionary of Legal Terms and Citations [1934], p. 216.) (Italics the court's.) " Security " is defined as " something which makes the enjoyment or enforcement of a right more secure or certain" (*First National Bank* v. *Hollinsworth*, 78 Iowa, 575, 580; 43 N. W. 536), and as " that which secures or makes safe " (Century Dict.). In the court's opinion, subdivision 5 of section 425 was intended to apply to all claimants possessing the right to look to something other than the dividends received from the insolvent insurer for the satisfaction, complete or partial, of their claims against the latter. To permit such claimants to prove for the full amount of their claims without any deduction for the mortgage or interest in the mortgage owned by them, would be contrary to the spirit, if not the express letter,

of the statute. The court accordingly holds that the four claims are " secured," within the meaning of subdivision 5.

A contention is made by counsel for the Westchester trustees, as *amicus curiæ*, that subdivision 5 of section 425 of the Insurance Law has no application to the rights of holders who acquired their certificates or policies of guaranty prior to March 15, 1932, the date said subdivision went into effect. If subdivision 5 worked a change in the law existing at the time of its passage, there might be considerable force to the argument that any attempt to apply it retroactively would be unconstitutional as impairing the obligation of contracts. In view, however, of the fact that the section merely restates, in somewhat different language, the provisions which had been part of section 63 of the Insurance Law since 1918, it must be evident that the position taken by counsel for the Westchester trustees is untenable, except, perhaps, as to certificates or guaranties issued prior to 1918. No such certificates or guaranties are involved here.

We turn now to the question of how the value of the mortgages, or undivided interests therein, held by the claimants shall be determined. Some urge that the mortgages should be appraised at the value of the underlying real estate, after deduction of prior liens and the cost of foreclosure. The Superintendent of Insurance, on the other hand, takes the position that the claimants hold mortgages, not real estate, and that the mortgages must, therefore, be valued as mortgages, and not as realty. In the court's opinion, the Superintendent's analysis is the correct one. It would be manifestly unjust to compel claimants to submit to a deduction from their claims of the value of the mortgaged real estate as of July 15, 1935, unless they were in a position on that day to sell the real estate and realize its then market value. None of the claimants owned any mortgaged realty on July fifteenth, and none could, therefore, convert its appraised value into cash or its equivalent. Let us take, for example, the case of a claimant holding a mortgage which he had an immediate right to foreclose on July 15, 1935, by reason of defaults in interest and/or taxes. If any set of facts can be said to call for the application of the " value of the realty " method of appraisal, advocated by those opposing the Superintendent's view, this would seem to be the one. Yet a moment's reflection will render it readily apparent that even in this type of situation it would be highly inequitable to charge the mortgagee with the value of the real estate. Assuming that he commenced a foreclosure action on July 15, 1935, and that no obstacles of any kind were placed in the way of the prompt prosecution of the action,

the sale of the realty pursuant to the judgment of foreclosure could not occur for *at least* several months thereafter, during which the property might well depreciate in value to a substantial extent below the July fifteenth valuation. Moreover, even after the commencement of the foreclosure action the mortgagor might avail himself of the provisions of section 1077-e of the Civil Practice Act and obtain a dismissal of the action by making good the defaults in interest and/or taxes, in which event the mortgagee might be compelled to wait years before he would be legally free to foreclose and thus realize the value of the mortgaged real estate with which he is sought to be charged. Undoubtedly, the value of the realty is a very important factor in determining the value of the mortgage. It is not, however, as those urging the " value of the realty " rule, in effect, contend, the *sole* factor. Such cases as *Matter of Solt-mann* (238 Fed. 241) and *Matter of Dix* (176 id. 582), cited by the committee of creditors of Lawyers Mortgage Company, as *amicus curiæ*, are not in point, for in each of them a foreclosure judgment had been obtained by the creditor and the property actually sold. The court is of the view that a mortgage, though in default and in a position to be foreclosed on July 15, 1935, must be valued as a mortgage, and not as real estate. *A fortiori* is this true of a mortgage not in default as to interest or taxes on July 15, 1935, for the right to foreclose such a mortgage and realize the value of the underlying land may not accrue to the mortgagee for many years, if at all. The contrary view urged upon the court by the stockholders of the guaranty company and others, wholly disregards or overlooks the very important fact that claimants holding mortgages, or undivided interests in mortgages, which had not been foreclosed on July 15, 1935, were not the owners of the underlying real estate at that time and were unable to sell the same and obtain the then market value thereof. They may only be charged with the value of the security which they possessed, viz., unforeclosed mortgages on real estate. They may not be charged with the unobtainable value of realty which they did not own.

The court's views in this respect find support in a recent decision of the Federal court (*Matter of Bankers Mortgage Co. of Topeka, Kansas*, decided Dec. 23, 1935).* The court there said: " The appraisement found a $4,000 mortgage, with a financially irresponsible mortgagor, on a house and lot appraised at $3,000. Manifestly the mortgage is not worth $3,000, for it must be foreclosed at considerable expense; possession cannot be had during foreclosure and in the period of redemption — at least two years — and in the meantime, taxes and insurance run on and the property runs down. The appraiser took the advice of several concerns with long and

---

* No opinion for publication. Affd., 83 F. [2d] 50.

wide experience in mortgages, and found the mortgage to be worth 60 per cent of the value of the property. I think that is the right way to get at value. The stockholders say the mortgage is worth the value of the property less the estimated costs of foreclosure. No one seeking to buy a mortgage would pay that for it. So I think the appraiser did his duty in ascertaining the present value of the mortgage instead of estimating the value of real estate two years hence, less estimates of foreclosure expenses, taxes, insurance, depreciation, etc."

It is urged that a recent decision of the Appellate Division in the Second Department, YOUNG, J., dissenting (*Matter of Bond & Mortgage Guarantee Co. [City Bank-Farmers Trust Co.; New York Polyclinic Medical School & Hospital*], 247 App. Div. 911) is authority for charging claimants with the value of the realty underlying the mortgages held by them. To the extent that the views there expressed may be regarded as applicable to the valuation of security held by claimants in a liquidation proceeding against an insurance or guaranty company, this court finds itself unable to agree with them.

In this connection, it is well to take up the contention made by certain stockholders of the guaranty company that the claims against the liquidator are subject to the set-off provided for in section 1083-b of the Civil Practice Act. That section provides that: " In any action  *  *  *, other than an action to foreclose a mortgage, to recover a judgment for any indebtedness secured by a mortgage on real property  *  *  *, against any person or corporation directly or indirectly or contingently liable therefor, any party against whom a money judgment is demanded, shall be entitled to set off the fair and reasonable market value of the mortgaged property less the amounts owing on prior liens and encumbrances." This provision is, however, inapplicable here for several reasons. The section, *by its terms*, refers only to " any *action*  *  *  * to recover a judgment upon any indebtedness secured by a mortgage on real property." (Italics the court's.) A claim filed in a liquidation proceeding is not an " action  *  *  * to recover a judgment." That the statute is restricted to actions has been recently held by the Appellate Division in the Fourth Department. (*Kress* v. *Central Trust Co.*, 246 App. Div. 76.) In that case a depositor sued to recover the amount of his deposit. The bank pleaded a set-off for the amount due it on a bond and mortgage which the plaintiff had delivered to it as security for a loan. The latter urged that he was entitled to a credit for the fair value of the real estate underlying the mortgage. The court overruled this contention in the following language (pp. 79-80): " These

provisions of the emergency statutes would undoubtedly be applicable to the obligation of the plaintiff if the defendant were bringing an action upon the plaintiff's obligation arising from the assumption of the mortgage debt, but the provisions did not cancel the indebtedness of the plaintiff or change the jural relations of the parties. They merely suspended for the period of the emergency certain remedies which the mortgagee would otherwise have enjoyed. After the enactment of the emergency statutes the plaintiff owed the amount of the bond, payment of which had been assumed by him, to the same extent that he owed it before the passage of the act, and he could claim no immunity by virtue of the statutes except in relation to having an action brought against him to recover on the mortgage indebtedness (or to foreclose the mortgage) or to having judgment rendered against him in an action on the bond for a greater amount than the difference between the amount due on the bond and the fair and reasonable market value of the mortgaged property. No action, however, has been brought against the plaintiff and, therefore, the emergency statutes are of no avail to him. The defendant in its answer alleges a set-off of mutual debts as an affirmative defense. The principle upon which the New York rule of set-off rests is that in case of mutual debts it is only the balance which is the real or just sum owing. * * * The defendant's answer embodies a true affirmative defense and not even a counterclaim, and an affirmative defense is certainly not an action within the meaning of the emergency statutes. Even if the affirmative defense should be construed to be a counterclaim, such a counterclaim would not be an action. (*Taylor* v. *Mayor, etc., of the City of New York*, 82 N. Y. 10; *New York Title & Mortgage Co.* v. *Irving Trust Co.*, 241 App. Div. 246.) The conclusion follows that the emergency statutes for the relief of mortgagors have no application to this case and that the defendant was justified in setting off mutually matured debts." Furthermore, application of the emergency laws to the claims filed against the liquidator would be contrary to the *spirit*, as well as the letter, of those statutes. " The purpose of these acts was to ' prevent a mortgagee from foreclosing property and from obtaining, in addition, an exaggerated deficiency judgment against the mortgagor ' (Memorandum of Governor, April 24, 1934, on act extending the period to July 1, 1935)." (*Weisel* v. *Hagdahl Realty Co., Inc.*, 241 App. Div. 314, 316.) As the Court of Appeals said in *City Bank Farmers Trust Co.* v. *Ardlea Corp.* (267 N. Y. 224, 227): " The clear purpose of the Legislature was to prevent the foreclosure of real property mortgages for default in the payment of principal during the emergency period, also to prevent any actions on bonds given simultaneously with

such mortgages and secured thereby and upon guaranties of payment of such mortgages or bonds given therewith." The laws were obviously intended to apply only to those who *voluntarily* instituted actions during the period of abnormally depressed values *instead of waiting for the expiration of the emergency and the return of normal conditions.* Here, the holder of the company's guaranty has no choice or option between asserting his claim in the liquidation proceeding and withholding enforcement of the guaranty until the emergency has ended. Unless the claim is filed with the liquidator within the time limited by order of the court, all rights upon the guaranty are lost forever. The filing of the claim is, in effect, *forced* upon the claimant, and is not his voluntary act in any real sense of the word. There is nothing in the emergency statutes to indicate a legislative purpose that they were to apply to mortgagees who were deprived, without their consent, of all right to enforce the guaranties held by them after the expiration of the emergency. That the intention was the very contrary is evident from the provisions of section 1077-f which extends the time within which " any action or proceeding within the scope of this act " may be brought for a period of " one year after the termination of the emergency." To give the claimant the choice of submitting to the set-off provided for in the emergency laws or else forfeiting his claim upon the guaranty entirely is manifestly unjust. No such interpretation of the statutes should be resorted to, at least in the absence of clearer evidence that this was the Legislature's intent.

Another proposition advanced by stockholders of the guaranty company is that " contracts of guaranty of all mortgages, the time for the payment of any part of the principal of which, or the time for the foreclosure of which was extended by the mortgage moratorium laws, were by such laws released and invalidated." The argument is made that the moratorium statutes materially modified the guaranteed obligations and that " the provisions of said statutes purporting to preserve the liabilities of guarantors of mortgage obligations are not effective for that purpose " because the surety " must sit by and, it may be, see the property upon which he has relied for exoneration lose its value through the lapse of time — failure of repairs, change of character of neighborhood and the like — things which, had he control of the property, he might foresee and guard against." It is to be noted that the claim that the company was discharged from liability on its guaranties does not apply to mortgages in default as to interest or taxes, for the right to foreclose such mortgages is not suspended by the emergency statutes, and the guaranty company's rights as subrogee are, therefore, not interfered with. In addition, it is conceded that the

argument does not apply to certificates in group series where the company has been held to be the primary debtor *and not a guarantor.* The contention that the guaranty company was released *in any case* by the mere enactment of the moratorium statutes is one which the court cannot agree with. If the extension of time for the mortgagor's payment of principal were the voluntary act of the holder of the guaranty, the company's obligations as guarantor might be discharged unless it consented to the alteration of the guaranteed obligation. The fact is, however, that the extension of time in respect of the payment of principal was effected by the Legislature and was wholly involuntary from the viewpoint of mortgagees. No case has been cited which the court regards as persuasive authority for the proposition that a *statutory* suspension of a creditor's remedies against his debtor operates as a release or discharge of his rights against the guarantor of the indebtedness. The law appears to be to the contrary. In Arant on Suretyship we find the following pertinent language (§ 53, p. 189): " It is expressly provided in the Federal Bankruptcy Act that the discharge of a debtor in a proceeding under the Act shall not affect the obligation of his surety. Quite apart, however, from this express provision, the same conclusion should be reached. The courts generally say that the principal's discharge, and the consequent loss of further remedy against him, results, under such circumstances, from the operation of law rather than from the creditor's voluntary act." Even where creditors have voluntarily joined in bankruptcy proceedings or in compositions under the Bankruptcy Act which have resulted in the discharge of the principal obligors, a surety's obligation has been held to survive on the theory that the principal's obligations were modified by operation of the statute. (*Easton Furniture Mfg. Co.* v. *Caminez,* 146 App. Div. 436; *Silverman* v. *Rubenstein,* 162 N. Y. Supp. 733; *Matter of American Paper Co.,* 255 Fed. 121.) Moreover, even if it be assumed that a statutory alteration of a guaranteed obligation might, under certain circumstances, release a non-assenting guarantor, no such principle would be applicable to the emergency statutes here involved. It is extremely doubtful that the provisions suspending the remedies of a mortgagee for the period of the emergency would have been upheld as a valid exercise of the police power of the State if they extinguished or destroyed any of the rights of the mortgagee, instead of merely postponing their enforcement. (*Klinke* v. *Samuels,* 264 N. Y. 144, 149; *Home Building & Loan Assn.* v. *Blaisdell,* 290 U. S. 398; *Matter of People* [*Title & Mortgage Guarantee Co. of Buffalo*], 264 N. Y. 69.) *This is true not only of the rights on the bond and mortgage but also of rights on guaranties thereof.*

Sections 1077-a and 1077-b of the Civil Practice Act expressly provide that the due date of any principal falling due during the emergency is extended until six months, and, in some cases, one year, after the expiration of the emergency. Section 1077-f provides that " any action or proceeding within the scope of this act, which would have been maintainable at any time during the period of the emergency, shall not be barred by any provision of article two of the Civil Practice Act during a period of one year after the termination of the emergency." The same statutes which operate to suspend or alter the guarantor's rights as subrogee of the bond and mortgage, work an equal suspension or alteration of the mortgagee's rights on the mortgage. To hold that the provisions purporting to preserve all the mortgagee's rights, including those against a guarantor, are ineffective as against the latter, would remove the only basis upon which the emergency statutes have been upheld as constitutional, namely, that they do not extinguish rights but merely postpone remedies. The provisions referred to constitute an integral part of the comprehensive scheme of the statutes. Furthermore, the purpose of the moratorium statutes was to benefit and protect guarantors, not to injure them by impairing their rights. As the Court of Appeals said in *City Bank Farmers Trust Co.* v. *Ardlea Corp.* (*supra*, at pp. 228, 229): " That language (§ 1077-b) indicates an intent on the part of the Legislature to extend the *beneficial* provisions of these sections not only to the original makers of mortgages, bonds and guarantors thereof, but also to any guaranty of such mortgages and bonds, even though executed and delivered subsequent to the execution and delivery of an original bond and mortgage. * * * Those sections thus read afford *protection* not only to makers of original mortgages, bonds and guarantors thereof, but also to any party who is contingently liable as guarantor. Such we believe to have been the intention of the Legislature as expressed in the statutes and manifestly within the spirit and purpose of the enactments." (Italics mine.) At this point it should be recalled that the moratorium laws were first enacted at a time when the guaranty company was already in rehabilitation because of its inability to meet its obligations. (*Matter of New York Title & Mortgage Co.*, 156 Misc. 186.) Since then the company has been placed in liquidation because of its insolvency. (*Matter of New York Title & Mortgage Co.*, *supra*, p. 195.) At no time since the emergency statutes took effect has the company had the right under the regulations promulgated by the Superintendent of Insurance to make good out of its own funds any defaults on the part of mortgagors. Payments to holders of guaranties have been limited to collections made by the

company or by its rehabilitator or liquidator. *It follows that the right of subrogation which, it is claimed, has been destroyed or impaired by the legislation referred to, was at most a purely potential one which never actually came, or could have come, into existence. Until full payment of the guaranteed obligation the guarantor is not subrogated to any part of the security.* The claim that the emergency statutes discharged the guaranty company as to any of the claims asserted against it, is accordingly overruled.

In the case of each of the four claims under consideration on the present motion, appraisers have properly valued the mortgages involved as *mortgages,* and *not as real estate.* The motion to confirm would, therefore, be granted, were it not for the failure of the Superintendent's report to disclose the financial condition of the obligors of the bonds and mortgages underlying the four claims. As the solvency of the obligors is to be presumed, in the absence of proof to the contrary (*Thomas* v. *Zahka,* 228 N. Y. 187), and as their financial condition is undoubtedly a factor to be considered in determining the value of the bonds and mortgages, the facts bearing upon the financial circumstances of the obligors should be disclosed to the court and it should also appear that the appraisers took these facts into consideration in valuing the mortgages.

As a supplemental report is, therefore, necessary, the court deems it appropriate to point out that the appraisers have followed an erroneous method of computing the value of an undivided interest in a mortgage, whether represented by certificates or otherwise. For example, one of the four claims is based upon a $5,000 certificate in a single mortgage of $350,000. The value of the mortgage has been appraised as of July 15, 1935, at $286,000. The value of the certificate has been fixed at 5,000/350,000 of $286,000 (with a minor adjustment in respect of a small balance in the assignment of rents account). No consideration appears to have been given to the practical difficulties confronting the owner of a fractional interest in a mortgage who wishes to obtain concerted action by his co-owners or fellow certificate holders. These difficulties are matters of which the court can take judicial notice. They have been recognized by the Legislature itself in enacting the Mortgage Commission Act (Laws of 1935, chap. 19), section 1 of which states: " The holders of mortgage investments in many thousands of issues are numerous and it has been difficult to obtain concerted action by them." The difficulties and expense involved in securing the co-operation of sufficient certificate holders (or co-owners) to enforce a mortgage, through a reorganization proceeding or otherwise, must be taken into account in estimating the value of an undivided interest in the mortgage. The language of

Mr. Justice SHEARN, writing for the Appellate Division in this department, in *Matter of Gibert* (176 App. Div. 850), is peculiarly applicable here (pp. 851, 852):

" The appeal taken by the Comptroller is on the ground that by an erroneous method adopted by the appraiser in fixing the values of a certain fractional interest in real property the interest of the decedent therein had been undervalued.

" There are several parcels of real estate to which the Comptroller's appeal relates. As to each one the decedent was the owner of an undivided one-third interest. Certain of the parcels were covered by a general mortgage and in addition there was a mortgage upon the one-third interest of the decedent in the property. It is conceded that it is proper to make a deduction in valuing an undivided fractional interest in real property because of the diminution of value which results from the fact that it is an undivided fractional interest only. This deduction is due in part to cover the expenses incident to a partition action, but is chiefly due to the fact that the owner of such an undivided interest, particularly if, as in the case at bar, it be a minority interest only, cannot control it, but holds it practically at the mercy of the owners of the other interests. For such an interest there is only a limited market, the proof being that experience shows that the purchasers of undivided interests are usually speculators and operators. This restrictive market for such interests lowers their market value. The method adopted by the appraiser for computing the value of decedent's undivided interest in such a parcel was to place a value on the parcel as a whole and then, taking one-third thereof, make a deduction of fifteen per cent of such one-third interest therefrom, and from this result deduct the amount due on the mortgage covering the decedent's one-third interest and also one-third of the amount due on the mortgage covering the entire parcel, *i. e.*, the three-thirds interest therein belonging to all the owners. The net result is the value of the decedent's one-third interest in the real property."

In view of the fact that the report does not touch upon the financial condition of the obligors of the bonds secured by the mortgages, and in view further of the method of valuing undivided interests in mortgages employed by the appraisers, the motion to confirm will be held in abeyance pending the submission of a supplemental report on notice to all who have appeared.