119 A.3d 313

### In re PENN TREATY NETWORK AMERICA INSURANCE COMPANY in Rehabilitation.

Appeal of Teresa D. Miller, Insurance Commissioner of the Commonwealth of Pennsylvania.

### In re American Network Insurance Company in Rehabilitation.

Appeal of Teresa D. Miller, Insurance Commissioner of the Commonwealth of Pennsylvania.

Supreme Court of Pennsylvania.

Argued Sept. 10, 2014.

Decided July 20, 2015.

Ryan Clark Blazure, Esq., Thomas, Thomas & Hafer, L.L.P., Wilkes–Barre, for Jerome Lawrence.

Douglas Y. Christian, Esq., Benjamin Moshe Schmidt, Esq., Damian L. DiNicola, Esq., Philadelphia, Ballard Spahr Andrews & Ingersoll, L.L.P., for Penn Treaty American Corporation and Eugene J. Woznicki.

Constance B. Foster, Esq., Harrisburg, James Steven Gkonos, Esq., Paul M. Hummer, Esq., Saul Ewing, LLP, Philadelphia, for Affinion Group, American Insurance Planners, Apex Financial Group, Inc., Association Member Benefits, Barbara Quaife–Hopkins, Century Senior Services, Cornerstone Senior Services, LLC, Dean L. Wilde Agency, Inc., 5 Star Companies LLC, G.A. Legg & Associates, Irving Levit Insurance Management Corp., Jim Sines Insurance Agency, Inc., Lawrence J. Ochs, Lehmann Wood Johnson, Inc., Lehmann/Wood & Associates, Inc., Linda Gardner, Linda Sanvall, Long Term Care Advisors, Long Term Care Associates, Inc., Long Term Care Consultants, Long Term Care LLC, LTC Financial Partners, LLC, M&O Marketing, Inc., Mario J. Posteraro, Mark David Cohn, Marion J. Reitmeyer, Mark Heller Insurance Services, Mature Health Services, Medical Insurers Association of VA, Inc., National Coverage Agency, Premier Senior Marketing, LLC, Randall Hargett, Richard E. Rosen, Steven Moskowitz, TWG Capital Inc., Western Asset Protection, Wolf and Associates, Inc., American Life and Health, William E. Laufbahn Agency, Inc., General Agency Development Services, Mayfield Financial & Estate Protection Services, Martel Agency, M.J. Kahn & Associates, Inc., James Gottfurcht.

Michael R. Kelley, Esq., Harrisburg, Charles Thomas Young Jr., Esq., York, McNees, Wallace & Nurick, LLC, for National Health Administrators, Inc.

Barry E. Harris, Pro Se.

Carl Merritt Buchholz, Esq., Carl H. Poedtke III, Esq., Jayne Y. Risk, Esq., Stephen Schwab, Esq., Nathan Heller, Esq., Adam Brown, Esq., Stephen Schwab, Esq., Nathan

Heller, Esq., Adam Brown, Esq., DLA Piper US, LLP, Philadelphia, Preston M. Buckman, Esq., Amy Griffith Daubert, Esq., Laura Ann Gargiulo, Esq., PA Department of Insurance, James Reeves Potts, Esq., Cozen & O'Connor, Philadelphia, for Michael F. Consedine.

Gerald E. Arth, Esq., Fox Rothschild, LLP, Philadelphia, for National Association of Insurance Commissioners.

Mark David Bradshaw, Esq., Stevens & Lee, P.C., Harrisburg, for Pa. Life & Health Ins. Guaranty Assoc. and the Nat'l Org. of Life & Health Ins. Guaranty Assoc.

Ira Scott Bergman, Esq., for Penn Treaty Network America Insurance Company in 94 MAP 2012.

Ira Scott Bergman, Esq., for American Network Insurance Company in 95 MAP 2012.

David L. Harbaugh, Esq., Morgan Lewis & Bockius, L.L.P., Philadelphia, for Independence Blue Cross.

Vera Sue McAnulty, Esq., Welch, Gold & Siegel, P.C., for Brian Allen.

Abbott & Associates, Pro Se.

John E. Adcox, Pro Se.

Dennis Adler, Pro Se.

W. Wayne Allen, Pro Se.

American Benefit Concepts, Pro Se.

American Diversified Insurance Services, Pro Se.

AmeriLife & Health Services of Asheville, LLC, etc., Pro Se.

Rene Apack, Pro Se.

Mahmoud Attari, Pro Se.

James R. Baker, Pro Se.

Dave Barnes Sr., Pro Se.

Donald Barnes, Pro Se.

Basic Financial Solutions, Pro Se.

Alex Berkowitz, Pro Se.

Mark Berlin, Pro Se.

Stanley Block, Pro Se.

Jay P. Bogen, Pro Se.

Vincent J. Bono, Pro Se.

John A. Booth, Pro Se.

Cheryl Bosley, Pro Se.

James Bosley, Pro Se.

Mark Boudreaux, Pro Se.

Bradley Associates Insurance Services, Inc., Pro Se.

Carl E. Breitenstein, Pro Se.

James M. Brinda, Pro Se.

Robert E. Brown, Pro Se.

Louis Brownstone, Pro Se.

Rebecca J. Brumbaugh, Pro Se.

Burgess & Associates, Pro Se.

Paul H. Burns, Pro Se.

Don H. Campbell, Pro Se.

Lisa Capierseho, Pro Se.

Charles Roy Carney, Pro Se.

Central Insurance Agency Inc., Pro Se.

Lynn Champagne, Pro Se.

Betty B. Christopher, Pro Se.

Michael R. Clark, Pro Se.

Daryl Cohen, Pro Se.

Thomas C. Cole, Pro Se.

Ronald Coleman, Pro Se.

James L. Collins, Pro Se.

Dorothy W. Connell, Pro Se.

Thomas E. Conrey, Pro Se.

Robert B. Coursault, Pro Se.

Patricia R. Courtney, Pro Se.

William O. Daggett Jr., Pro Se.

James Davis, Pro Se.

Sheri DiBello, Pro Se.

Lillian DiLaurenzo, Pro Se.

James M. DuBrueler Jr., Pro Se.

William E. Ebert, Pro Se.

Mike Ebrahimoon, Pro Se.

Martin Eigen, Pro Se.

Charles M. Ellers, Pro Se.

Phyllis Ellis, Pro Se.

Dave Ermlick, Pro Se.

Sheila Ermscher, Pro Se.

Greg Estes, Pro Se.

Samuel Thomas Farmer, Pro Se.

Martin J. Feldsher, Pro Se.

Larry E. Fordham Sr., Pro Se.

Donna Forman, Pro Se.

Stephen D. Forman, Pro Se.

Barbara Fried, Pro Se.

Michael I. Frye, Pro Se.

Lisa Fuhrman, Pro Se.

Robert C. Ginther, Pro Se.

Howard Gnatowsky, Pro Se.

Larry Goldberg, Pro Se.

Marci Golden, Pro Se.

Glenn M. Goldman, Pro Se.

David Gottschalk, Pro Se.

Helaine Gottschalk, Pro Se.

Mark Graber, Pro Se.

Gloria J. Green, Pro Se.

Richard G. Green, Pro Se.

Davig G. Greenhut, Pro Se.

Robin L. Grimm, Pro Se.

Paul E. Gronefeld, Pro Se.

Robert W. Haines, Pro Se.

Gerald W. Hall, Pro Se.

Diana Hammons, Pro Se.

Barbara Haselden, Pro Se.

Paul D. Hauser, Pro Se.

David W. Hayter, Pro Se.

Carl Mark Heller, Pro Se.

Janet L. Henning, Pro Se.

Charles D. Hicks, Pro Se.

Steven N. Hollaway, Pro Se.

William E. House, Pro Se.

Mary Hughes, Pro Se.

Patricia Hyder, Pro Se.

Insurance Marketing, Inc., Pro Se.

Insurance Services Administration Company, LLC, Pro Se.

Intercoastal Insurance Services, Inc., Pro Se.

Robert Isenhower, Pro Se.

Michael Jackson, Pro Se.

Ronald J. Jacobson, Pro Se.

Elizabeth R. Jacquemetton, Pro Se.

Lynda Jacquot–Imberi, Pro Se.

Marion E. Jirovsky, Pro Se.

Catherine L. Jones, Pro Se.

John F. Jones, Jr., Pro Se.

Michael J. Jones, Pro Se.

Rodney L. Jones, Pro Se.

William R. Kaczmarek, Pro Se.

Robert A. Kaldenberg, Pro Se.

George Karmazyn, Pro Se.

Ray Kastl, Pro Se.

Blaine Keller, Pro Se.

Richard L. Kimmel, Pro Se.

Phillip A. Kirk, Pro Se.

David Kitaen, Pro Se.

Richard L. Kobermusz, Pro Se.

Dennis A. Koch, Pro Se.

Irene Krinsky, Pro Se.

Sue A. Lamar, Pro Se.

Frank T. Lamartine, Pro Se.

Jim Lapinski, Pro Se.

James R. Lee, Pro Se.

Don C. Lekvold, Pro Se.

Dennis Lentin, Pro Se.

Dolores Lentin, Pro Se.

Donna Trenary Leonard, Pro Se.

F. Bert Lerch, Pro Se.

Faith H. Light, Pro Se.

Long Term Care Senior Health Division, LLC, Pro Se.

LTC Insurance Services, Inc., Pro Se.

Norman Lyon, Pro Se.

Stacy MacDonald, Pro Se.

William T. MacKinnon, Pro Se.

Charles L. Magee, Pro Se.

Harvey Mann, Pro Se.

Gary Marso, Pro Se.

Patrick T. Maude Jr., Pro Se.

Sean G. McErlean, Pro Se.

Daniel McGettigan, Pro Se.

Gary L. McGlothlin, Pro Se.

Brent McNabb, Pro Se.

Dolores A. McNamara, Pro Se.

James C. McNamara, Pro Se.

Medigap, LLC, Pro Se.

Joe Medina, Pro Se.

Kenneth A. Meller, Pro Se.

Allen Mergaman, Pro Se.

Larry Mikolajcik, Pro Se.

Jim Miller, Pro Se.

Ronald T. Miller, Pro Se.

Donald Minkus, Pro Se.

Perry Morin, Pro Se.

Rosalie Morthole, Pro Se.

National Insurance Network, Inc., Pro Se.

Network Insurance Senior Health Division, LLC, Pro Se.

Northwest Farmer Stockman, Inc., Pro Se.

NW Senior Resources, Pro Se.

Allen Ohnheiser, Pro Se.

Lynn O. Olson, Pro Se.

Dave Ostrem Jr., Pro Se.

Larry D. Oswald, Pro Se.

Kenneth H. Overcash, Pro Se.

Donald L. Paulus, Pro Se.

Steven L. Pelly, Pro Se.

Stephen C. Perry, Pro Se.

C. Don Petersen Sr., Pro Se.

Roy Petty, Pro Se.

Paulette A. Pevsner, Pro Se.

Ronald E. Pevsner, Pro Se.

Jerrold R. Pfingsten, Pro Se.

Philadelphia Area Long Term Care Guild, Pro Se.

Ken Phillips, Pro Se.

Bartholomew B. Piccardo, Pro Se.

Professional Insurance Planners and Consultants, Pro Se.

Kerry Psinas, Pro Se.

Jeffrey E. Raelson, Pro Se.

Sheldon L. Ray, Pro Se.

Gary H. Reaves, Pro Se.

Gary Repper, Pro Se.

Alvin A. Rexing, Pro Se.

Paul M. Riddle, Pro Se.

Gerald D. Rieker, Pro Se.

Robert C. Roark, Pro Se.

Philip L. Robbins, Pro Se.

Michael M. Robinson, Pro Se.

Norm Rons, Pro Se.

Mel Rose, Pro Se.

Sonya Rubin, Pro Se.

R. Runestad, Pro Se.

Randy Sabers, Pro Se.

Nicholas Salerno, Jr., Pro Se.

Sarasota Health and Financial Services, Inc., Pro Se.

Michael Satterfield, Pro Se.

Ryan A. Saul, Pro Se.

Alan Gregory Sayo, Pro Se.

Steve Scarbrough, Pro Se.

Ross Schriftman, Pro Se.

Gary Scism, Pro Se.

Senior Help Associates, Inc., Pro Se.

Shirley Shaw, Pro Se.

Helen C. Shupe, Pro Se.

John R. Shupe, Pro Se.

Harry Fletcher Smith, Jr., Pro Se.

Thomas H. Smith, Pro Se.

Maurice P. Solie Jr., Pro Se.

Tom Soucy, Pro Se.

Patricia L. Spencer, Pro Se.

Mark E. Stanley, Pro Se.

Deborah Stas, Pro Se.

Laura Stensrud, Pro Se.

Cindy Stillwell, Pro Se.

Susanna Stock, Pro Se.

Charlotte Stonestreet, Pro Se.

Ronnie L. Stonestreet, Pro Se.

Ken Story, Pro Se.

Ken Stotmeister, Pro Se.

Benjamin E. Sumner, Pro Se.

Matt Sussman, Pro Se.

Jamie Swanbom, Pro Se.

Michael F. Taylor, Pro Se.

Sonny Thapar, Pro Se.

The LTC Exchange, Ltd., Pro Se.

G.D. Toole, Pro Se.

Samuel L. Torrez, Pro Se.

Curtis E. Vahle, Pro Se.

Americe Vavak, Pro Se.

Rhonda Vry–Bills, Pro Se.

Mary Wagman, Pro Se.

Carl L. Walbert, Pro Se.

Marie Wallace, Pro Se.

James W. Waltes Jr., Pro Se.

Martha L. Warren, Pro Se.

Dennis Waton, Pro Se.

West Florida Life and Health, Pro Se.

Western Asset Protection, Inc., Pro Se.

Kenneth Wheeler, Pro Se.

Mike Wheeler, Pro Se.

Thomas R. Whiston, Pro Se.

David B. Wientjes, Pro Se.

Dean L. Wilde, Pro Se.

David M. Wilkins, Pro Se.

Richard Williams, Pro Se.

Tony Winkelman, Pro Se.

Mark R. Wolfe, Pro Se.

Phyllis Lee Young, Pro Se.

Leonard Zanello, Pro Se.

Gretchen Zomermaand, Pro Se.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

## *OPINION*

PER CURIAM.

This appeal concerns the efforts, over time, of three different Insurance Commissioners, acting in their capacity as

statutory rehabilitators, to convert insurance rehabilitation proceedings into liquidations.

Penn Treaty Network America Insurance Company ("PTNA") and its subsidiary, American Network Insurance Company ("ANIC") (collectively, the "Companies"), are Pennsylvania life insurers specializing in long-term care insurance, covering skilled-nursing, nursing home, and assisted living and home health care for individuals with chronic illnesses or disabilities. In January 2009, the Commonwealth Court ordered the rehabilitation of the Companies, upon application of then-Insurance Commissioner Joel Ario, who cited the consent of both entities as the sole grounds for the orders of rehabilitation. In accordance with the governing statutory scheme, *see* 40 P.S. § 221.15, the Commonwealth Court appointed Commissioner Ario as statutory rehabilitator.

The Companies' troubles began in the 1990's, when they widely sold policies carrying generous benefits, which proved to be underpriced and poorly underwritten. These policies are referred to here as "OldCo policies," because by 2002 the Companies were issuing better underwritten policies (the "NewCo policies") which became profitable. The financial fallout from the sale of OldCo policies, however, resulted in the involvement of numerous state regulators, including the Pennsylvania Insurance Department, which commenced an eight-year period of formal supervision of the Companies.

Rate increases for OldCo policies were a linchpin in the Companies' prospects for improving their financial condition, but these required approval from state regulators across the nation, and efforts to obtain such approval attained disparate results. The inability to secure enough increases, and the Companies' deteriorated solvency, apparently led to their ultimate consent to rehabilitation.

Nine months after entry of the rehabilitation order, however, Commissioner Ario filed petitions to covert the Companies' rehabilitations into liquidations. *See* 40 P.S. § 221.18. Penn Treaty American Corporation ("PTAC"), the owner of PTNA, and Eugene J. Woznicki, Chairman of the Board of Directors

of PTNA and of PTAC (collectively, Intervenors), intervened to oppose the liquidation petitions.

The controlling statute, section 518(a) of Article V of the Insurance Department Act of 1921,[1] provides that "[w]henever he has reasonable cause to believe that further attempts to rehabilitate an insurer would substantially increase the risk of loss to creditors, policy and certificate holders, or the public, or would be futile, the rehabilitator may petition the Commonwealth Court for an order of liquidation." 40 P.S. § 221.18(a). Grounds for liquidation existed, because both Companies indisputably were and are insolvent, see id. §§ 221.19, 221.14, although they had substantial assets and the means to pay claims for years to come. Given the undisputed grounds for liquidation, the central focus of the proceedings in the Commonwealth Court was placed on the propriety of conversion, which, again, is measured according to whether further attempts at rehabilitation would substantially increase the risk of loss or would be futile. See id. § 221.18.

The Commonwealth Court, per a single-judge proceeding, conducted hearings spanning thirty days of testimony and encompassing the submission of thousands of pages of exhibits and documentary evidence. The parties presented conflicting expert testimony from numerous witnesses, including actuaries from Milliman, Inc. (formerly retained by the Companies to provide actuarial services, but presently providing expert evidence in support of the Commissioner), Ernst & Young (experts retained by the Commissioner), INS Consultants, Inc. (experts retained by the Commissioner), and United Health Actuarial Services, Inc. (experts retained by Intervenors). Intervenors presented evidence to support their position that future premium revenue—enhanced by rate increases and earnings on assets and cash flow—would cover future claims that will develop over the next sixty years. The Commissioner, then Michael F. Consedine, presented evidence to the contrary, in support of his position that continued rehabilitation was futile and that liquidation was warranted.

1. Act of May 17, 1921, P.L. § 789 (as amended 40 P.S. §§ 1–326.7).

In May 2012, the Commonwealth Court entered an order denying the petitions to liquidate and directing the Commissioner to develop a plan of rehabilitation within ninety days.[2] The order required that the rehabilitation plan "must address and eliminate the inadequate and unfairly discriminatory premium rates for the OldCo business." The order further directed that "the Rehabilitator will not refuse to pay claims or refuse to renew the Companies' long-term care insurance policies without prior Court approval." The court also issued a 164–page decision including extensive findings of fact and conclusions of law which she summarized as follows:

> The Rehabilitator's evidence did not show that a rehabilitation was tried and failed. Rather, it showed that a rehabilitation plan was abandoned in its nascency. In short, the Rehabilitator did not prove that continued rehabilitation substantially increases the risk to policyholders, creditors and the public or is futile. The quality assets held by the Companies and the existence of guaranty funds provide a safety net for their policyholders during continued rehabilitation. By contrast, liquidation promises immediate harm to the policyholders, creditors and the public, as the Rehabilitator acknowledged to the Court in his Preliminary Plan.

*Consedine v. Penn Treaty Network Am. Ins. Co.,* 63 A.3d 368, 380 (Pa.Cmwlth.2013).

A critical facet of the Commonwealth Court's opinion concerned the degree of deference owing to a statutory rehabilitator on consideration of a conversion petition. Based on *Koken v. Legion Insurance Co.,* 831 A.2d 1196 (Pa.Cmwlth. 2003), *aff'd sub nom. Koken v. Villanova Ins. Co.,* 583 Pa. 400, 878 A.2d 51 (2005), the court determined that judicial deference to the administrative actor simply was not appropriate, where the court was required to apply specific statutory standards. *See Penn Treaty,* 63 A.3d at 440 (quoting *Legion,* 831 A.2d at 1230). According to the court, this holding was

**2.** While that filing has occurred, it is clear from the submissions to the Commonwealth Court that the present Commissioner, Teresa D. Miller, is moving forward with rehabilitation essentially under protest and subject to a reservation of rights relative to the present appeals.

consistent with the law of other states. *See id.* (citing *LaVecchia v. HIP of N.J., Inc.,* 324 N.J.Super. 85, 734 A.2d 361, 364 (Ch.Div.1999)).

The Commissioner,[3] however, has identified a difficulty with the Commonwealth Court's decision in such regard, namely, that the court's no-deference determination was, in fact, inconsistent with the case which it had referenced as being supportive. Far from refusing to apply deference in the context of whether a statutory rehabilitator had reasonable cause to believe that further efforts toward rehabilitation would increase the risk of loss or be futile, the Superior Court of New Jersey's Chancery Division in *LaVecchia* stated that *"deference is to be given* [to] the Commissioner's decision to seek liquidation under" the analogue to Section 518(a). *LaVecchia,* 734 A.2d at 364 (emphasis added). In point of fact, the *LaVecchia* court's allusion to withholding deference to the administrative apparatus related to the determination of the appropriateness of an order of liquidation under the governing statutory standards (which, in both Pennsylvania and New Jersey, include insolvency). *See* N.J. Stat. Ann. § 17B:32–46; 40 P.S. §§ 221.19, 221.14. Notably, the matter of insolvency has never been in question relative to the Companies in the present case.

To the degree deference was withheld in cases cited by the Commonwealth Court in *Legion,* the reviewing court had also addressed the substantive determination of insolvency (or other statutory grounds for liquidation) under statutory analogues to Section 519, 40 P.S. § 221.19, and not any statute corresponding to the reasonable cause standard to support conversion established in Section 518(a). *See Florida Dep't of Ins. v. Cypress Ins. Co.,* 660 So.2d 1177, 1182–83 (Fla.Dist.Ct. App.1995) (withholding deference relative to an insurance department's "findings and interpretation regarding the necessity for liquidating or rehabilitating" an insurance company per a provision of Florida law investing the courts with the

3. The briefs submitted in this Court were lodged by Commissioner Considine. The new Commissioner has been substituted in the caption per the applicable Rule of Appellate Procedure. *See* Pa.R.A.P. 502(c).

duty to determine whether appropriate grounds for liquidation or rehabilitation exist, *see* FLA. STAT. § 631.031), *cited in Legion,* 831 A.2d at 1232 n. 84; *Angoff v. Cas. Indem. Exch.,* 963 S.W.2d 258, 263 (Mo.Ct.App.1997) (expressly distinguishing a rehabilitator's reasonable belief that further rehabilitation would be futile and increase the risk of loss, in a conversion context, from the substantive decision of whether the underlying grounds for rehabilitation or liquidation exist), *cited in Legion,* 831 A.2d at 1232 n. 84.

In their brief, Intervenors reference only two other decisions (besides *Legion* ) in support of the position that no deference is due under Section 518(a): *Matter of Globe & Rutgers Fire Ins. Co.,* 148 Misc. 497, 266 N.Y.S. 29 (N.Y.Sup. Ct.1933), and *In re New York Title & Mortgage Co.,* 156 Misc. 186, 281 N.Y.S. 715, 725–26 (N.Y.Sup.Ct.1935). These cases, however, also expressly confirm the deference due to the administrative agency involved in advancing a petition for conversion. *See Globe & Rutgers,* 266 N.Y.S. at 31 ("The court has great confidence in [the] judgment [of the regulator] and recognizes that the recommendations and views of an administrative officer charged with the performance of statutory duties are entitled to great weight and careful consideration and are not to be disregarded or brushed aside except for cogent reasons."); *New York Title,* 281 N.Y.S. at 729 ("Only the strongest showing to the contrary could justify the court's refusal to follow the recommendations of the administrative officer to whom the supervision of insurance companies has been intrusted [sic] by the Legislature.").[4]

■ Not only are there no decisions supportive of the Commonwealth Court's no-deference approach to Section 518(a), the weight of the authorities affirmatively addressing the matter is to the contrary. *See, e.g., Kentucky Cent. Life*

4. With due consideration for deference, the *Globe & Rutgers* court afforded those opposing a conversion fifteen days to assure the court of the solvency of a company in rehabilitation, on pain of entry of a liquidation order. *See Globe & Rutgers,* 266 N.Y.S. at 33. In *New York Title,* the court deferred to an insurance superintendent's judgment in moving from rehabilitation to liquidation. *See New York Title,* 281 N.Y.S. at 729.

*Ins. Co. v. Stephens,* 897 S.W.2d 583, 588 (Ky.1995) ("With the judgment of the Commissioner of Insurance being that liquidation was subsequently desirable and necessary, we determine that only a strong showing to the contrary would have justified the trial court's refusal to follow the recommendations of the administrative officers to whom the supervision of the insurance company was entrusted by the legislature."); *State ex rel. Flowers v. Universal Care of Tenn., Inc.,* No. M2006–00929–COA–R3–CV, *slip op.,* 2007 WL 3072776, at *4 (Tenn.Ct.App. Oct. 22, 2007) (commenting that "[t]he General Assembly, not the courts, have entrusted the Commissioner with the independent judgment and discretionary power to seek liquidation of insurance companies within the statutory guidelines," with reference to Tennessee's analogue to Section 518(a)); *New York Title,* 281 N.Y.S. at 729. Indeed, the framework entailing deference embodied in these cases is consonant with the direction set by this Court in *Foster v. Mutual Fire Ins. Co.,* 531 Pa. 598, 614 A.2d 1086, 1093 (1992) (explaining, in the context of modifications to a rehabilitation plan, that "[t]his Court has concluded that this great deference in favor of the Insurance Commissioner and the resulting narrow scope of review for the courts are in recognition of the expertise of the administrative agency or individual officer assigned the task of regulating a given industry").[5]

 Consistent with the above and the position of the Commissioner and one of her *amici,* the National Association

5. Intervenors argue that this Court's *per curiam* affirmance of *Legion* on the basis of the Commonwealth Court's opinion establishes our previous adoption of the no-deference approach. However, the matter of deference, in the relevant aspect, was never placed before this Court in *Legion,* and we decline to sustain an incorrect interpretation of law in such circumstances.

In *Commonwealth v. Tilghman,* 543 Pa. 578, 673 A.2d 898 (1996), this Court explained that a *"per curiam* order is never to be interpreted as reflecting this Court's endorsement of the lower court's reasoning in discussing additional matters, in *dicta,* in reaching its final disposition." *Id.* at 904. In our considered judgment, any discussion of matters not raised on appeal in this Court, albeit that they may have been essential to an intermediate court's decision under review, is *dictum* in the context of a *per curiam* affirmance, even one specifically based on the intermediate court's opinion.

of Insurance Commissioners, we find that judicial review of a statutory rehabilitator's decision to seek conversion under Section 518(a) generally is to be undertaken with due deference to the rehabilitator and is governed by an abuse-of-discretion standard.[6] While the stakes are certainly high, the fact of the matter remains that if grounds for liquidation exist, as they do here, the regulators were never obliged to support rehabilitative efforts in the first instance. *See* 40 P.S. § 221.19. Thus, for purposes of Section 518(a), the Commonwealth Court ordinarily should confine its inquiry to whether the reasonable cause requirement of Section 518(a) was satisfied, again, with due regard for the Commissioner's expertise in such arena.[7]

█ Nevertheless, in the extensive review undertaken, the Commonwealth Court found, in essence, that a former Commissioner or Commissioners had made improper use of the rehabilitation device in the first instance and failed to exercise candor with the court. *See, e.g., Penn Treaty,* 63 A.3d at 447 ("[T]he Rehabilitator did exactly what this Court in *Legion* stated that a rehabilitator should not do: he has treated the rehabilitation as a conservatorship to give him time to prepare for liquidation."); *id.* at 458 ("The Rehabilitator has not made an earnest effort ... but, rather, looked for reasons to be excused from [his] duty."). In all events, deference does not require the courts to accede to a misuse of the process. In light of the above, and the former Commissioner's accession at the outset of the rehabilitation proceedings that liquidations would be harmful to policyholders, *see id.* at 390, as well as the Commonwealth Court's supported finding that there is no present harm in moving forward in rehabilitation, *see, e.g., id.* at 459 ("The Companies are meeting their obligations as they come due and will be able to do so for many years[.]"), we decline to impede that court's review of the rehabilitation plan

6. Review of the decision to seek conversion, of course, is separate and apart from the separate determination as to whether a liquidation order ultimately should issue.

7. In this respect, we also agree with the Commissioner that the "reasonable cause" overlay of Section 518 should not be decoupled from the risk-of-loss and futility factors.

which it directed should be filed, and which has now been submitted. The judicial review, however, should proceed subject to a more deferential overlay relative to the new acting Commissioner. *See Foster*, 614 A.2d at 1093.[8]

The order of the Commonwealth Court is affirmed.

Former Chief Justice CASTILLE and former Justice McCAFFERY did not participate in the decision of this case.

Justice TODD files a concurring and dissenting opinion.

Justice TODD, concurring and dissenting.

I join the Majority in rejecting the Commonwealth Court's interpretation of 40 P.S. § 221.18(a) ("Section 518(a)") which required that, in order to convert the rehabilitation process of an insolvent insurer into a liquidation of that company, the Pennsylvania Insurance Commissioner ("Commissioner") must "prove, as a matter of fact, that [the] insolvent insurer's immediate financial circumstances are in such disarray that they are completely unsalvageable," or that the Commissioner

---

**8.** In her concurring and dissenting opinion, Madame Justice Todd portrays the evidence in a light most favorable to the Commissioner, although the Commissioner was not the prevailing party in the Commonwealth Court. This approach appears to represent an effort to compensate for the Commonwealth Court's failure to apply appropriate deference to the Commissioner in the first instance. In our view, however, it is unsatisfactory to disregard one side's evidence and the initial findings of the court of original jurisdiction in their entirety, particularly where that court specifically rejected material aspects of the Commissioner's evidence. *Compare, e.g.,* Concurring and Dissenting Opinion, at 310, 119 A.3d at 335 (characterizing the Milliman analysis in support of liquidation as "an accurate depiction of the Companies' deficiencies"), *with Penn Treaty,* 63 A.3d at 378, 402, 429–39 (rejecting substantial portions of the Milliman analysis upon consideration of the broader evidentiary record).

Along these lines, we also differ with Justice Todd's assertion that there is no evidence supporting the Commonwealth Court's finding relative to a former Commissioner's conduct in failing to advance the rehabilitation process per which the judicial process was invoked initially. *See, e.g., id.* at 392–93 (explaining that the Insurance Department refused to approve essential premium rate increases, terminated rate increase filings in other states several months before petitioning for conversion, elected not to implement some rate increases which already had been approved, and otherwise "took steps to impede pursuit of actuarially justified premium rate increases.").

must "adopt a rehabilitation plan, and, then, have its implementation fail." *Consedine v. Penn Treaty Network,* 63 A.3d 368, 447, 458 (Pa.Cmwlth.2012). Section 518(a) places no such exacting obligations on the Commissioner, but, instead, all that its express language requires for the Commissioner to obtain an order of liquidation from the Commonwealth Court is that the Commissioner show that he or she possesses "reasonable cause to believe that further attempts to rehabilitate [the] insurer would substantially increase the risk of loss to creditors, policy and certificate holders, or the public, or would be futile." 40 P.S. § 221.18. This statutory requirement of "reasonable cause" is a considerably lesser burden of evidentiary proof for the Commissioner to meet than the standard applied by the Commonwealth Court in this matter, which, in essence, required the Commissioner to show, factually, that rehabilitation of the insurance companies involved in this appeal—Penn Treaty and American National Insurance Company ("ANIC"), hereinafter referred to as "Companies" [1]—was impossible.

Therefore, I agree with the Majority that, under Section 518, the Commonwealth Court must apply an abuse of discretion standard when reviewing the Commissioner's administrative decision to convert a rehabilitation proceeding to a liquidation. Such a standard is in accord with our Court's prior admonishment that a reviewing court should exercise "great deference" to decisions of the Commissioner made while acting in his or her capacity as rehabilitator of an insolvent insurer, due to the Commissioner's unique professional expertise in regulation and oversight of the insurance industry. *Foster v. Mutual Fire,* 531 Pa. 598, 614 A.2d 1086, 1093 (1992). Consequently, judicial review in this instance is "limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions." *Blumenschein v. Housing Authority of Pittsburgh,* 379 Pa. 566, 109 A.2d 331, 335 (1954). The fact "[t]hat the court might have a different opinion or judgment in regard to the action of the agency is not a sufficient ground for interference; *judicial* discretion may not

1. ANIC is a wholly owned subsidiary of Penn Treaty.

be substituted for *administrative* discretion." *Id.* (emphasis original); *Foster,* 614 A.2d at 1092; *Bowman v. D.E.R.,* 549 Pa. 65, 700 A.2d 427, 428 (1997); *see also* Couch on Insurance, § 5.23 (acknowledging that, while courts have a role in controlling the insurance commissioner's exercise of his or her powers, a court "may not, however, use its supervisory role as a means of substituting its judgment for that of the commissioner.").

However, the Majority goes on to affirm the Commonwealth Court's order denying the Commissioner's liquidation petition, agreeing with the lower court's implication that the Commissioner lacked candor and abused the rehabilitation process. The Majority does so, even though the Commonwealth Court's decision was based on its *de novo* review of the evidence, and its findings that the Commissioner "treated the rehabilitation as a conservatorship to give him time to prepare for liquidation," and that the Commissioner did not make "an earnest effort to correct the condition that caused the Companies' financial difficulties: the pricing structure for the OldCo ... policies ... but, rather, looked for reasons to be excused from that duty." *Consedine,* 63 A.3d at 447, 458. By contrast, application of the proper abuse of discretion standard leads me to conclude, as I discuss below, that the record supports the Commissioner's conclusion that liquidation was warranted because he had reasonable cause to believe that continued efforts at rehabilitation were futile, and also that continuing with the rehabilitation process would substantially increase the risk of loss to policyholders.[2] I must, therefore, respect-

2. While, in response to my expression, *see* Majority Opinion at 291 n. 8, 119 A.3d at 323 n. 8, the majority correctly notes that, under Section 518(a), the Commonwealth Court has original jurisdiction over a petition to convert a rehabilitation proceeding to a liquidation, this does not mean that the Commonwealth Court, in ruling on such a petition, sits as if it were a trial court making findings of fact in the first instance as to whether the Commissioner possessed reasonable cause to liquidate the insolvent insurer. To the contrary, and as the majority seemingly concedes, that court must apply a deferential abuse of discretion standard, which requires it to function as a reviewing court, and, as such, its role is limited to determining whether the Commissioner abused his or her discretion in finding that reasonable cause existed to convert the rehabilitation of the insolvent insurance company to a

fully dissent from that portion of the Majority's decision which affirms the Commonwealth Court's overturning of the Commissioner's determination that liquidation of these Companies was the appropriate course of action.

The record in this matter reflects that the Pennsylvania Insurance Department ("Department") has been actively and continuously engaged in addressing these Companies' ongoing financial difficulties since 2001—a period of time spanning the tenures of four separate commissioners. These Companies sold "long-term care" policies [3] in all fifty states during the 1990s.[4] Prior to 2002, Penn Treaty sold lucrative, but badly

liquidation. *See* Majority Opinion at 289–90, 119 A.3d at 322–23; *see also Foster*, 614 A.2d at 1091 (observing that, in conducting discretionary review of the Commissioner's decisions made during the conduct of the rehabilitation process, "it is not the function of the courts to reassess the determinations of fact and public policy made by the Rehabilitator"). If the evidence relied on by the Commissioner supports the findings on which his or her administrative decision is based, as, in my view, it does here, then the Commissioner has not committed an abuse of discretion, and his or her decision should be upheld by the Commonwealth Court. *Federal Kemper v. Pa. Dept. of Ins.*, 143 Pa. Cmwlth. 545, 600 A.2d 244, 248 (1991). Thus, the majority's acquiescence in the Commonwealth Court's "reject[ion]" of evidence and its "finding[s]" based thereon, Majority Opinion at 291 n. 8, 119 A.3d at 323 n. 8, is, from my perspective, inconsistent with the abuse of discretion standard which it agrees is applicable. *See also* Amicus Brief of National Association of Insurance Commissioners at 17 (expressing the view that the Commonwealth Court exceeded its proper role because it "attempted to place itself into the shoes of the Commissioner, and did not simply determine whether the Commissioner's decision was an abuse of discretion").

3. These policies provided benefits to the policyholder in the event that he or she required skilled nursing services, intermediate care, custodial care or home health care due to chronic illness or disability, whether such services were provided in the policyholder's home or at an external facility. Commissioner's Preliminary Report and Rehabilitation Plan, 4/6/09, at 6. A typical policy, though providing lifetime benefits, and guaranteed to be renewable so long as the policyholder paid the premiums, was priced at only about 50% of what was needed to support such benefits. N.T. Hearing, 2/1/11, at 182–83.

4. Although ANIC sold only NewCo policies, because it is a wholly owned subsidiary of Penn Treaty, the financial situations of both are inextricably intertwined, and the actual managerial and administrative functions of ANIC are performed by the management of Penn Treaty. Milliman Surplus Projection Report, 10/15/09, at 8; Milliman Preliminary Report, 4/2/09, at 8; Signal Hill Report (Appendix to Preliminary Rehabilitation Plan), 4/6/09, at 45–46.

underwritten, policies known as "OldCo" policies. After 2002, both Penn Treaty and ANIC began selling long term care policies which were more soundly underwritten than the Old-Co policies—referred to for purposes of these proceedings as "NewCo" policies. The Department's 2001 involvement was necessitated because the serious financial drain created by payouts under the OldCo policies caused the Companies to cease writing any new policies, but, nevertheless, saw their statutorily mandated capital reserves drained to below 150% by the mounting payouts under the OldCo policies. This resulted in the Companies being placed into a "regulatory action" classification which obliged them to work with the Commissioner—then Diane Koken—to develop and implement a corrective action plan to rehabilitate them. N.T. Hearing, 1/31/11, at 92–93.[5] At that time, the Companies enlisted the services of an actuarial consulting firm—Milliman—to prepare the corrective plan and assist in its execution. *Id.* at 93.

Milliman did actuarial projections as to the shortfall the Companies faced as a result of future claims under the OldCo polices and computed the amount of rate increases which would be needed to rehabilitate the Companies.[6] Based upon these projections, the Companies and Milliman devised a plan to bolster the Companies' capital reserves by $125 million, which depended on the Companies' acquisition of reinsurance—for an annual fee of $12 million—as well as obtaining rate increases for the OldCo policies from insurance regulatory agencies in each of the states where it had sold them. *Id.* at 93–94, 122; N.T. Hearing, 2/16/11, at 78–79. Such further rate increases were needed, even though, in 2001, the Companies had already asked for, and received, authorization from

---

**5.** The Commissioner also contemplated liquidating the Companies at that time. N.T. Hearing, 2/2/11, at 33.

**6.** Such actuarial projections involved predicting the amount of revenue which would be generated by premiums from existing and new policies, as well as investment earnings and expenses, and, additionally, predicting the amount which would have to be paid out in claims made under policies based on "morbidity," i.e., the health of the policyholder making a claim, which influences the duration and total cost of the benefits paid out under the claim. N.T. Hearing, 1/31/11, at 111, 170, 189.

these same state regulators for rate increases on the OldCo policies, because of the growing number, and dollar value, of actual and projected claims being made under those policies. N.T. Hearing, 1/31/11, at 122, 124–25. The Companies received from regulators 92% of the amounts they had requested in the 2001 round of rate increases. *Id.* at 122.

The Companies' corrective plan was approved by the Commissioner in February 2002. N.T. Hearing, 1/31/11, at 93. Thereafter, the Companies, with the supervision and involvement of the Commissioner, undertook additional efforts to secure rate increases on the OldCo policies from almost all of the state regulatory bodies with jurisdiction over them. The first such rate increase requested pursuant to the implementation of the corrective plan was in 2003 for 16%, and the Companies received approval from 80% of the state regulators. *Id.* at 125–26. However, regulatory agencies expressed discomfort at having to grant this second round of rate increases, given the size and magnitude of the first round of rate increases they had granted only a short time before. *Id.* at 127.

Milliman continued to perform analyses of the claims payouts under the OldCo policies from 2003–2005, and determined that the rate increases which had been approved were insufficient to cover the losses caused by those payouts; accordingly, Milliman recommended additional rate increases be pursued. *Id.* at 127–28. The Companies' management approved this course of action and sought a 22% rate increase in late 2005 from those states which had denied the 2003 rate increases. Commissioner's Preliminary Report and Rehabilitation Plan, 4/6/09, at 21. 66% of these requested increases were ultimately approved. *Id.* Once more, however, the revenue from these increases was insufficient to cover the worsening claims situation created by the OldCo policies. N.T. Hearing, 1/31/11, at 130.

Further actuarial analysis of the payouts under the OldCo policies led to the Companies requesting a 37% rate increase from state regulators in 2006, of which only 54% were granted by 2009. Commissioner's Preliminary Report and Rehabilita-

tion Plan, 4/6/09, at 21. Resistance by state regulators to these successive rate increase requests had, by then, grown to the point where some regulators either refused the requests outright, or granted much lower amounts than requested. N.T. Hearing, 1/31/11, at 138. In *toto*, according to the Commissioner's data, the Companies were granted only $80.3 million of the approximately $128.02 million in rate increases they sought during the time period 2003–2009—a success rate of 63%. FBR Analysis, September 2008, (Plaintiff's Exhibit P–0007), at 43.

In addition to the continuing financial stress on the Companies due to claim payouts under the OldCo policies, a new problem arose during 2006 and 2007 when the volume of reserve capital needed to pay current and future claims began to approach the limits covered by their reinsurer. Eventually, in 2008, the Companies fell $12 million short of the credit needed from the reinsurer to maintain the level of capital reserves called for in the corrective action plan, and the reinsurer refused to increase the amount of credit it was providing to the Companies. N.T. Hearing, 1/31/11, at 154–55. Ultimately, in December 2008, the Companies terminated the reinsurance agreement and reabsorbed approximately $113 million in outstanding liability, which the reinsurer had previously covered via letters of credit. Commissioner's Preliminary Report and Rehabilitation Plan, 4/6/09, at 15. At this point, the Companies were projecting a year-end "negative surplus" in the range of $125 million.[7] N.T. Hearing, 1/31/11, at 168.

The additional financial stress created by the pending loss of reinsurance caused the board of directors of Penn Treaty to conclude that the Companies would be insolvent as of January 1, 2009, and prompted managerial representatives to approach the Commissioner—then Joel Ario—in the latter part of 2008

7. An insurer's negative surplus is the amount by which its reported liabilities exceeds its assets. *See, e.g.,* Jay Greene, *State Orders Health Plus Insurance To Find Financial Partner,* Crain's Detroit Business, March, *available at* http://www.crainsdetroit.com/print/article/20150315/NEWS/303159976/state-orders-healthplus-insurance-to-find-financial-partner.

to prepare to enter rehabilitation. N.T. Hearing, 1/31/11, at 182. During preliminary discussions held at that time between representatives of the Companies and deputy commissioners from the Department, the Companies' representatives reported to the deputy commissioners that they were facing a shortfall because of the loss of reinsurance of approximately $100 million. N.T. Hearing, 2/2/11, at 35. Based on these representations, the Commissioner and his staff believed, then, that this reported deficiency, while "extraordinary" in its amount, could possibly be addressed by a combination of rate increases and reductions in agents' commissions. *Id.* at 35, 39, 51. The Commissioner's staff undertook extensive preparations to begin the rehabilitation process, a substantial portion of which was devoted to retaining the Companies' employees so that, when the Commissioner assumed managerial control of the Companies, their core business would continue. *Id.* at 42–44.

In January 2009, the Commissioner, with the consent of the management of the Companies, filed a petition for rehabilitation, which was granted by the Commonwealth Court on January 6, 2009. The order of the Commonwealth Court directed the Commissioner, as statutory rehabilitator, to, *inter alia*, file a "preliminary" plan of rehabilitation by April 6, 2009. Commonwealth Court Order, 1/6/09, at 5. Commissioner Ario was designated the rehabilitator and his Deputy Commissioner—Joseph DiMemmo—who had been involved with monitoring these Companies since shortly after they had been required to take corrective action in 2001, was given primary responsibility for overseeing the rehabilitation process. N.T. Hearing, 2/2/11, at 50. Thereafter, Deputy Commissioner DiMemmo formed a rehabilitation implementation committee with the managerial staff of the Companies, which included the Companies' CFO, Mark Cloutier, and Robert Robinson, an insurance professional who had successful experience managing the rehabilitation of an insolvent insurer and who was designated by the Commissioner to be the Chief Rehabilitation Officer of the Companies, handling their day to day operation during rehabilitation. N.T. Hearing, 2/2/11, at 91–93; 2/3/11,

at 180, 184. Subsequently, this committee met on a weekly basis to assess the status of the rehabilitation process and to consider the feasibility of pursuing various rehabilitation options. N.T. Hearing, 2/2/11, at 99.

The Commissioner chose Milliman to perform the actuarial analyses required for the preparation of the interim rehabilitation plan—inasmuch as he had specifically retained Milliman to provide these types of services during rehabilitation, as Milliman had considerable experience with the Companies' unique financial situation, and as it had developed a claims reserve model which considered the Companies assets and liabilities. N.T. Hearing, 2/2/11, at 70–75. Milliman—using the available financial statements provided by the Companies which, by then, showed a negative surplus for the Companies of $223 million at the end of 2008, and relying on its claims reserve model, which valued future claims costs based on the amount of claims paid by the Companies from 1993–2006—prepared projections estimating when the Companies' surpluses could be brought back to a positive level, and, also, when those surpluses could be brought back to the level at which enhanced regulatory oversight by the Department would no longer be necessary. Milliman Report, 4/2/09, at 1, 16. Milliman based its projections on varying levels of assumed reductions in the Companies' operating expenses, i.e., claims administration costs, commissions, etc., coupled with immediate aggregate rate increases on all OldCo policies and NewCo policies ranging from 17.3% to a maximum of 42.3%. Under the most optimistic of Milliman's projections, if, on January 1, 2010, operating expenses were reduced by $20 million and rate increases of 42.3% on all policies were implemented, then the Companies' surplus would turn positive in 2013 and they would be free of regulatory oversight in 2015. Lesser levels of expense reductions and rate increases resulted in the dates of solvency, and freedom from Department supervision, being pushed back correspondingly. Milliman estimated that a minimum rate increase of greater than 27.3% was needed on the OldCo policies, alone, or the Companies

would never escape negative surplus status. Milliman Preliminary Rehabilitation Report, 4/2/09, at 10.

In preparing his Preliminary Rehabilitation Report for the Commonwealth Court, the Commissioner also considered a study prepared by a consultant—Signal Hill Capital Company—he had retained to evaluate possible alternative financing arrangements available to the Companies, such as: raising additional capital from third parties, obtaining other re-insurance, and selling all or part of the Companies. The Commissioner noted in his preliminary report that Signal Hill had determined that none of those options was feasible at the time due to the Companies' weakened financial position, and that the most viable means of rehabilitating the Companies was through rate increases on the OldCo policies and reduction of the Companies' operating expenses. Commissioner's Preliminary Report and Rehabilitation Plan, 4/6/09, at 47. Based on Milliman's and Signal Hill's determinations that rate increases were necessary for rehabilitation, the Commissioner indicated in his preliminary report that, in developing his final plan of rehabilitation, he was giving consideration to "how rate increases could be quickly and effectively authorized and implemented." *Id.* at 50.

Critically, the Commissioner also noted that, at the time of the preliminary report, he had not yet completed a liquidation analysis, which would include a state by state review of the availability of guaranty association coverage [8] in the event the

8. Guaranty associations ("GAs") are statutorily created non-profit entities in each of the 50 states and the District of Columbia. They are comprised of insurance companies doing business in the jurisdiction, each of which pays a tax or assessment to the association based on the volume of business the insurer conducts in the jurisdiction. The GAs protect policyholders when their insurer becomes insolvent or is liquidated by guaranteeing, assuming, or reinsuring each policyholder's benefits up to the limits mandated by statute in its jurisdiction, or it transfers those policies to a solvent insurer which becomes obligated to do the same. In exchange, the GAs receive the premium payments under the policies and, as subrogees of the policyholders, may assert claims against the insolvent insurer's estate for distribution of its assets. *See Couch on Insurance,* §§ 6.27–28, 6.30. Thirty-six states, including Pennsylvania, have statutory limits of $300,000 for long-term care insurance, 7 states have limits in excess of $300,000, with New Jersey

Companies were liquidated. *Id.* at 47. The Commissioner stated in the report that "it appears that in liquidation, [Penn Treaty] will not be able to pay policyholder claims in full, and coverage available from state GA's [sic] are limited by statute in most states and therefore will not cover the entirety of many policyholder claims, especially for those policyholders with unlimited, lifetime benefits." *Id.* However, the Commissioner made no definitive conclusion in this regard, noting only that "[f]urther analysis of these issues is underway." *Id.* at 48. Although the Commissioner proposed in this preliminary report that any final plan of rehabilitation would be filed by October 2, 2009, he further stated in the preliminary report that he would make a final determination, once the liquidation analysis was complete, as to whether he would continue to pursue rehabilitation. *Id.* at 53. The Commissioner additionally cautioned that, should "continued rehabilitation of the Companies ... substantially increase the risk of loss to policyholders, creditors or the public, the rehabilitation plan could be modified or converted to a liquidation." *Id.* at 50.

In preparing the final rehabilitation plan, Milliman, at the direction of the Commissioner, compiled new long-term surplus projections for the Companies. As part of this process, Milliman re-analyzed claims payouts being made under the Companies' long-term care policies to determine the level of claim reserves the Companies would need to maintain to cover such claims. It was Milliman's observation that, since 2006, its claims reserve model, which predicted the amount of claims which would need to be paid in a given time period under the policies, had underestimated the value of the claims actually paid by $20 million. N.T. Hearing, 2/16/11, at 117–20, 141. Milliman performed a study of the problem and concluded that its model failed to account for "increasing severity in claim costs" caused by greater use of higher cost nursing homes, rather than assisted living facilities, and a higher number of claimants receiving lifetime benefits because they were living

having no limits, and only 6 states have less than $300,000 in coverage limits. *Amicus* Brief of Pennsylvania National Life and Health Guarantee Association and National Organization of Life and Health Guarantee Associations at 18–19.

longer. Milliman Actual Experience Analysis (Trial Exhibit P–0920), 4/28/08, at 2–3. Also, Milliman's study showed that its claims reserve model had previously projected higher savings as the result of anticipated "morbidity improvement" among policyholders which did not actually materialize.[9] N.T. Hearing, 2/17/11, at 32.

As a result of this study, Milliman adjusted its claims reserve model. N.T. Hearing 2/16/11, at 145–46. Beginning in May 2009, in conjunction with the rehabilitation team, Milliman used its upgraded model to perform additional future projections of claims reserves based on the actual dollar amount of claims the Companies paid during the last calendar quarter of 2008 and the first two calendar quarters of 2009. N.T. Hearing, 2/4/11, at 93. In performing this analysis, Milliman found that the value by which actual claims the Companies paid exceeded projected claims increased steadily and significantly during this time period, with actual claims exceeding projected claims by 9% at the end of 2008, 12% in the first quarter of 2009, and 15% in the second quarter of 2009. According to this trend, Milliman estimated that payouts to claimants would be 24% higher than anticipated during the third quarter of 2009. *Id.* at 94. This cost-escalation trend, which triggered the concomitant need to bolster the Companies' capital reserves to cover the increased payouts, caused great consternation among the members of the rehabilitation team. N.T. Hearing, 2/4/11, 97–98.

Because of his concern over the deteriorating claims reserve situation, Chief Rehabilitation Officer Robinson approached Deputy Commissioner DiMemmo to convey his concerns, and he recommended that an independent auditing firm be retained to review Milliman's work and verify it. *Id.* at 98. DiMemmo concurred with the recommendation, and the accounting firm of Ernst and Young was engaged for this task. Ernst and Young thereafter became a participant in the

9. As morbidity affects the likelihood that any given policyholder will be in active claim status in a given year, morbidity improvements such as advancements in healthcare and changes in lifestyle reduce the propensity for a policyholder to file a claim. N.T. Hearing, 2/16/11, at 120–22; Milliman Surplus Projections Report, 10/15/09, at 10.

rehabilitation process, evaluated Milliman's projections, and ultimately found no fault with them. *Id.* at 100–102, 199–200.

Based on its analysis of the Companies' actual claims experience with the long-term care policies as of June 30, 2009, Milliman prepared a full evaluation of what the Companies' actual financial condition would be at the end of 2009, and what it was likely to be a decade later in the year 2020, which took into account the necessary amount of reserves both Companies were obliged to maintain to cover all claims, present and future. Milliman prepared two estimates—one aggressive and one conservative—each based on assumptions about the Companies' ability to achieve cost containment, such as claims reductions due to a brain fitness program being implemented by the Companies for policyholders, expected annual morbidity improvements, and rate increases. Both estimates presumed that the Companies would cease paying commissions to their agents as of January 1, 2010. Milliman Surplus Projections Report, 10/15/09, at 9–12.

In the first estimate, using more aggressive assumptions about cost reduction, wellness and morbidity improvements, and the assumption that the Companies could achieve successful rate increases of 60% on the OldCo policies and 70% on the NewCo policies by 2013,[10] Milliman projected that, as of December 2009, Penn Treaty's negative surplus would stand at slightly more than $1.3 billion and ANIC's negative surplus at $45 million. Milliman Surplus Projections Report, 10/15/09, at 9, 15. Even with those levels of rate increases, Penn Treaty's negative surplus was projected to exceed $2 billion by 2020, and it would exhaust all of its assets by 2025. Similarly, by 2020, ANIC's negative surplus was projected to exceed $57 million, and its assets would be completely depleted by 2042. *Id.*

**10.** These projected rate increases were based on estimates from management of the Companies as to the upper range of attainable rate increases if the Companies were to remain in rehabilitation and continue to file for rate increases on a state by state basis. Milliman Surplus Projections Report, 10/15/09, at 31.

In the second estimate, using the more conservative assumptions, the financial position of the Companies worsened. Under those assumptions, if aggregate rate increases of 35% for Penn Treaty and 45% for ANIC were granted by 2013, Penn Treaty's negative surplus would stand at over $2.1 billion in 2009, grow to 3.4 billion by 2020, and completely consume all of its assets by 2021; whereas, ANIC's negative surplus would be $130 million in 2009, swell to $209 million by 2020, and drain the company completely by 2032. *Id.*

Milliman further found that, to achieve the goal of the Companies attaining solvency and exiting rehabilitation by 2025, they would need rate increases on their long-term care policies considerably in excess of these levels. Under the more aggressive assumptions outlined above, Penn Treaty would have to receive *total* rate increases by June 2010 of 180% on the OldCo policies, and ANIC would have to receive total rate increases of 104% on the NewCo policies. Using the above-referenced more conservative assumptions, by June 2010 Penn Treaty would need to obtain total rate increases of 232% on the OldCo policies, and ANIC would require total rate increases of 203% on the NewCo policies. Even if the goal to exit rehabilitation was delayed until 2050, substantial rate increases would still be required by June 2010 for them to become solvent, in the total range of 160–203% for Penn Treaty on the OldCo policies, and 82–165% for ANIC on the NewCo policies, again using the same upper and lower aggressiveness assumptions. Milliman Surplus Projections Report, 10/15/09, at 16.

Milliman's findings regarding the considerable size of the Companies' projected negative surpluses and needed rate increases were communicated by Chief Rehabilitation Officer Robinson to Deputy Commissioner DiMemmo prior to a weekly meeting of the rehabilitation committee in late August 2009. N.T. Hearing, 2/2/11, at 136–38; (Plaintiff's Exhibit P–0530). At the hearing held in this matter, DiMemmo recalled being shocked by the enormity of the numbers when they were relayed to him, as, in his view, the amount of the projected negative surpluses and required rate increases for a return to

solvency had "changed everything," such that rehabilitation was no longer viable. N.T. Hearing, 2/2/11, at 138. This was contrary to the opinion he had been previously relaying to the Commissioner based on Milliman's older 1993–2006 claims projection reports. *Id.* DiMemmo noted that he had never, in his experience as Deputy Insurance Commissioner, seen any long-term care insurance carrier receive rate increases of 200% during a rehabilitation process. *Id.* at 122–23. DiMemmo further opined that seeking rate increases of this size would be further complicated by the fact that the Department would have to approach the same state regulators who had previously been reluctant to grant the prior requested increases, discussed *supra,* which had been considerably smaller. *Id.* at 123.

Robinson concurred with DiMemmo's assessment that, given the historical experience involving regulators' approval of such increases, there was a low probability of this level of rate increase being granted, even though such increases might be actuarially justified. N.T. Hearing, 2/4/11, at 185–86. Importantly, Robinson noted that, even if such increases were granted by regulators, it would harm those policyholders not able to afford the increases and, consequently, likely cause them to reduce their benefit levels or drop the policies altogether, thereby losing their coverage. Robinson opined that for the Department to seek rate increases which would likely result in such an outcome was "not functioning in the best interest of the policyholders." *Id.* at 187.

In September 2009, DiMemmo, Robinson, and the other members of the rehabilitation committee met twice with Commissioner Ario. At the first meeting on September 14, the Commissioner requested a breakdown by state of the rate increases that would be needed. N.T. Hearing, 2/4/11, at 189. Because of the severity of the projected negative surpluses, and the enormity of the needed rate increases for solvency, Commissioner Ario accepted the unanimous recommendation of the rehabilitation committee that they should move, on a preliminary basis, toward liquidation. N.T. Hearing, 2/11/11, at 34. Commissioner Ario, however, also requested that the

committee consider whether there was any possible way to avoid liquidation and asked that they report back to him on any viable options. *Id.* at 35. The committee reviewed available options and, two weeks later on September 28, 2009, met with Commissioner Ario and again recommended unanimously that a liquidation petition should be filed. *Id.* at 36. Commissioner Ario agreed that, based on the projections, this was the best course of action, noting in his testimony at the hearing below that "[n]obody ever offered me, either internally or externally, any solution that would get by ... a negative balance of this dimension for a company of this size." *Id.* at 35.

Based on this new information indicating the depth of the insolvency of the Companies, the Commissioner concluded that liquidation, which would trigger access by policyholders to guaranty coverage, would be in the best interests of those policyholders. In the estimation of the Commissioner, GA coverage would fully cover the majority of policyholders, and for those whose benefits exceeded the statutory limits of guaranty coverage, they would still receive "substantially more complete payment of their claims." Amended Petition for Liquidation, 10/23/09, at 9. The Commissioner further determined that continued rehabilitation would result in a pernicious claims' preference—namely, that policyholders with claims coming due first would be paid their full level of benefits since the insurer still had assets to pay them, but, later in the rehabilitation process, policyholders would receive less as the assets of the insurer were depleted. *Id.* at 9–10. Accordingly, having concluded that continued rehabilitation of the Companies would be futile, given the magnitude of the rate increases needed to achieve solvency, and, also, that the interests of the policyholders would be better served by immediate liquidation, the Commissioner sought termination of the rehabilitation process and entry of an order of liquidation.

In my view, the Commissioner did not abuse his discretion in electing to cease rehabilitation efforts and pursue liquidation under these circumstances. *Foster, supra.* First, and

foremost, the evidence of record supports the conclusion that the Commissioner had reasonable cause to believe that continued rehabilitation of these Companies would be futile under the circumstances. 40 P.S. § 221.18(a). By the time Commissioner Ario made the decision to liquidate these Companies in October 2009, the Department had already worked with them for nearly a decade in attempting to rectify the serious financial problems created by the badly underwritten OldCo policies; thus, the Commissioner was keenly aware of the Companies' lack of success in obtaining considerably more modest rate increases from state regulators. Nevertheless, the record reflects that, when the Companies entered rehabilitation, the Commissioner, based on the information presented to him then about the Companies' financial status—which indicated that the Companies could possibly be returned to profitability through obtaining rate increases on all OldCo and NewCo policies ranging from 17.3% to 42.3% by 2013—was willing to consider pursuing that degree of rate increase. The record also supports the Commissioner's determination that, once this information proved to be inaccurate and the true status of the Companies' inability to pay future claims was revealed, i.e., that, in order for the Companies to achieve solvency within a reasonable length of time—a decade and a half—they would have to, by the *following June*, be granted approval by state regulatory bodies for a range of rate increases on all OldCo policies of at least 180%, and possibly as high as 232%, and be granted approval for rate increases on the NewCo policies of at least 104% and as much as 203%, the prospect of obtaining such massive increases was dim.

The Department's well-documented previous experience with these particular Companies being denied far lesser increases by regulatory bodies in the past indicated that the rate increases of this level would likely not be granted by these same bodies during a continued rehabilitation process. Indeed, at the time the Commissioner filed his liquidation petition, the broad experience of his actuarial consultant, Milliman, indicated that rate increases on long-term care policies, as a general matter, were becoming more difficult to

attain from state regulators, and, in Milliman's view, as the age of policyholders making claims under these policies increased over time, regulatory approval would only become progressively more difficult. N.T. Hearing, 2/24/11, at 10. Moreover, and importantly, as developed in the testimony at the hearing in this matter discussed *supra*, large rate increases would also likely result in many policyholders reducing their levels of coverage, or worse, dropping the coverage they had already paid for, at a time in their lives when they were most in need of such coverage. (Certainly, the prospect of such deleterious consequences was a compelling reason why state regulators were unlikely to grant such precipitous increases, given their fundamental responsibility to regulate the insurance marketplace and protect policyholders.) Hence, from my perspective, the Commissioner's conclusion that continuing with the rehabilitation process would be futile, since the rate increases which were essential for the Companies to return to solvency within a reasonable time frame were not likely to be achieved, was well-supported.

The record also supports the conclusion that the Commissioner had reasonable cause to believe that continued rehabilitation of these Companies would create a substantially increased risk of loss to policyholders in the form of reduced benefits. The Commissioner's liquidation analysis indicated that, if the Companies continued in rehabilitation without receiving the steep rate increases needed to make them solvent, then the assets of the Companies would be gradually depleted. This would result in a situation where current claimants would receive the full amount of benefits which they paid for, whereas future claimants would receive lesser amounts as the Companies' assets dwindled, and benefit levels payable under the policies would inevitably have to be capped in an effort to conserve the Companies' diminishing resources. N.T. Trial, 2/24/11, at 5–8.

The Commissioner found that the prospect of this disparate treatment of various groups of claimants could be avoided, however, by immediate liquidation of the Companies, as GAs in the home states of the various policyholders would then be

responsible for paying benefits up to their state's mandated benefit levels. Although not all policyholders would be entitled to receive their full benefits through immediate liquidation, it was the Commissioner's considered judgment at the time he sought liquidation—which was informed by the most accurate data available to him regarding the financial status of the Companies—that it was the best of all the options available to him. At the time he filed his liquidation petition, the Commissioner estimated that liquidation would result in the majority of the Companies' policyholders receiving greater benefits through the GAs—70 to 80% of the current benefit levels under their policies—than they would receive if the Companies continued in rehabilitation, which the Commissioner noted would, because of the large size of the projected negative surpluses, ultimately result in less of the policyholders' benefits being covered by guaranty coverage. N.T. Trial, 2/3/11, at 65–67, 70; Commissioner's Brief at 44. Thus, in my view, the Commissioner's liquidation decision was supportable on this basis as well, since it sought to diminish the harm to the individual policyholders caused by these Companies' insolvency.

Although the Commissioner admitted, at the time he filed his preliminary rehabilitation plan, that there were limits to GA coverage, he also informed the lower court in his preliminary rehabilitation report that he was continuing to analyze the issue of whether resort to such coverage would, ultimately, be in the best interests of all policyholders. The Commissioner also noted that he was specifically reserving final judgment on this issue until the necessary analysis of this question was complete. Upon completion of that analysis, and based upon it, the Commissioner reached the conclusion that GA benefits, though lesser, were still more than what the policyholders would achieve if the Companies were permitted to continue to steadily deplete their assets and cut benefits throughout the protracted rehabilitation process, which the Commissioner determined would ultimately be futile.

Critically, and contrary to the conclusion of the majority and the suggestion of the Commonwealth Court, in my view, this

record does not reflect any lack of candor by the Commissioner to the tribunal, but, rather, supports the conclusion that the Commissioner, after conveying his initial impressions to the lower court, based upon the information furnished to him by the Companies to that point in time, thereafter undertook a more comprehensive and deliberative evaluation which led him to his ultimate conclusion that resort to guaranty coverage would minimize prospective losses to policyholders. Furthermore, I do not find the evidence of record supports the Commonwealth Court's conclusion that the Commissioner somehow misused the rehabilitation process merely to bide time to prepare for liquidation.[11] As outlined above, the evidence of record supports the conclusion that the Commissioner initially acceded to the Companies' desire to pursue rehabilitation, and he was, during the preliminary phase of the rehabilitation process, working towards that goal. Indeed, the Commissioner hired a seasoned insurance professional to run the Companies, who had prior experience in rehabilitating a faltering insurer, and the Commissioner worked with the Companies' own actuary to devise a plan to return the Companies to solvency. The Commissioner was, at that point, wholly relying on the Companies' disclosures about their financial status to guide his decision-making process. It was only after the Commissioner received an accurate depiction of the Companies' deficiencies in their ability to pay future claims from the professionals he had engaged—some of whom were the Companies' own managerial staff—that he elected to convert the rehabilitation process to a liquidation. I, therefore, discern no misuse of the rehabilitation process by the Commissioner based on this record.

In sum, while I agree with the Majority that Commissioner Ario's decision to liquidate these Companies was reviewable under a deferential abuse of discretion standard, I dissent from the Majority's affirmance of the Commonwealth Court's denial of the Commissioner's petition to liquidate the Compa-

11. I note that the Commissioner is not statutorily obligated to pursue rehabilitation of an insolvent insurer at all if he or she deems the circumstances warrant an immediate liquidation to protect policyholders and creditors. 40 P.S. §§ 221.19–20.

nies, as, from my perspective, the Commonwealth Court failed to apply this standard and, instead, improperly substituted its own judgment for that of the Commissioner.